**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jerry A. MOORE, Defendant–Appellant.**

**No. 93–5767.**

United States Court of Appeals,
Fourth Circuit.

Argued March 11, 1994.

Decided June 22, 1994.

because it is closed.' '' But Youn did not say "I don't know because it is closed." He said, "It's closed."

**ARGUED:** Kenneth Joel Haber, Rockville, MD, for appellant. David Glenn Barger, Asst. U.S. Atty., Alexandria, VA, for appellee. **ON BRIEF:** Bill W. Bourland, Fairfax, VA, for appellant. Helen F. Fahey, U.S. Atty., Alexandria, VA, John M. Hodgens, Jr., Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, DC, for appellee.

Before WILKINS, LUTTIG, and MICHAEL, Circuit Judges.

Affirmed by published opinion. Judge LUTTIG wrote the opinion, in which Judge WILKINS and Judge MICHAEL joined.

## OPINION

LUTTIG, Circuit Judge:

Appellant Jerry A. Moore was convicted by a jury of thirteen felony counts arising out of several schemes to obtain real estate loans and other economic opportunities by misrepresenting financial information. He challenges his convictions on numerous grounds. Finding no error below, we affirm.

## I.

In March 1985, Moore prepared fraudulent income tax returns for Brandt Legg, who was seeking financing to purchase a commercial condominium to house his retail stamp business. Using Legg's actual tax returns as models, Moore drafted false 1982–84 income tax returns for both Legg and his business. After consulting with Legg as to what kinds of figures would be plausible, Moore completed the returns with concocted figures that overstated Legg's actual income by two to three times. He stamped the drafts "secret" and made clean handwritten copies of the returns. Contrary to Moore's instructions to copy the returns over in his own handwriting, Legg instead photocopied the returns, signed the copies, and then submitted them to the United Savings Association (USA) in support of his loan application. Relying on these documents, USA loaned Legg $230,000 to purchase the condominium. Moore, who held an option to buy the condominium and accepted a note in consideration of his option, received a $15,000 commission for brokering the deal.

In August 1985, Moore applied for a $76,000 loan from the United Savings Association in order to refinance a residential property that he owned. In support of his application, Moore submitted what purported to be copies of his 1982–84 federal income tax returns. These documents, however, overstated the income declared on his actual tax returns by four to seven times.

In late 1985, Moore purchased five commercial condominiums in a strip mall in Woodbridge, Virginia, from the mall's developer, Harry Vredenburg. Vredenburg had offered the units for sale for $800,000 and agreed to sell them to Moore at that price. However, in order to obtain financing for the full purchase price rather than just a percentage thereof, Moore persuaded Vredenburg to inflate the price shown on the sales contract. Although Moore was to pay Vredenburg only $800,000, the amount Vredenburg thereafter reported in his tax returns, the contract which Moore submitted to the

United Savings Association and Arlington Bank falsely represented that the price was $1,000,000. Those banks loaned Moore a total of $750,000, seventy-five percent of the price shown on the sales contract. Several days before closing, Moore, having secured loans for only $750,000, offered Vredenburg three undeveloped residential lots to make up the difference. Vredenburg, who testified that he thought the lots were worth about $100,000, agreed. At the closing Vredenburg signed a back-dated declaration provided by Moore that represented that the lots were worth $250,000.

Moore bought a sixth condominium in the Woodbridge strip mall from Sean McCarthy in June 1986. Moore and his vendor again agreed to misrepresent the purchase price in order to allow Moore to obtain a larger loan. Although Moore was to pay McCarthy only $163,000, the settlement statement reflected a sales price of $220,000. Community Bank and Trust loaned Moore $176,000 which he used to buy the sixth unit from McCarthy.

In November 1988, Moore sold the six condominiums for $1,030,000. The fraudulently obtained loans he had used to buy the condominiums were paid off in full, and Moore received a settlement check for $37,-290.90 reflecting his net proceeds from the sale. He deposited this check in a federally insured bank.

Moore reported his investment in the condominiums in his 1986, 1987, and 1988 federal income tax returns. In these returns, he falsely overstated the purchase prices of the condominiums and took commensurately inflated depreciation deductions.

In September 1990, Moore applied for a renewal of a $25,000 line of credit from the Sailors and Merchants Bank. The copy of his 1989 tax return that he submitted in support of his application showed that in 1989 he had had $116,116 in income. However, his actual 1989 tax return showed that he had had only $16,116 in income. At the same time, Moore also submitted financial statements to the Department of Defense supporting his application to serve as an individual surety for a prospective government contractor. These statements also falsely represented that he had $100,000 in income from Atlantic Investment Associates, Inc., and Atlantic Financial Investment Corporation when in reality, that income had not then been and was never realized.

In 1992, after Brandt Legg had implicated Moore in their 1985 bank fraud scheme, Moore, accompanied by counsel, was interviewed by an FBI agent, a postal inspector, and two Assistant United States Attorneys about his involvement in preparing Legg's false income tax returns. When shown the fraudulent tax returns which he had prepared for Brandt Legg, Moore falsely denied having prepared them or any other tax returns or financial statements for Legg. Moore also falsely denied that the handwriting was his.

In March 1993, Moore was charged with two counts of conspiracy, 18 U.S.C § 371; five counts of bank fraud, id. § 1344; one count of engaging in a monetary transaction in criminally derived property, id. § 1957; three counts of filing false income tax returns, 26 U.S.C. § 7206(1); and two counts of making false statements, 18 U.S.C. § 1001.

Three weeks before his trial was to begin, Moore moved for a continuance on account of his health. The district court denied the motion. On the Friday before his Monday trial was to begin—the same day a new attorney joined as co-counsel—Moore renewed his motion, contending that he was physically and psychologically unable to stand trial and psychologically unable to assist in his defense. At the hearing held on the morning of trial, Moore submitted a letter from his psychiatrist stating the opinion that Moore was suffering anxiety and depression that impaired his ability to assist meaningfully in his own defense, and a letter from his cardiologist briefly describing a heart condition for which cardiac catheterization had been recommended. In the alternative to a continuance, Moore requested the scheduling of an evidentiary hearing at which his psychiatrist would be called to testify. After considering the government's offer of proof, to which the defense acceded, the court found that Moore was able to stand trial, and denied the continuance.

The jury convicted Moore on all charges. He was sentenced to five years imprisonment for the crimes committed before the effective date of the Sentencing Guidelines, and to a concurrent thirty-six month sentence for those committed after that date.

## II.

■ Moore first contends that the district court erred in refusing to continue his trial on account of his mental and physical condition. A district court's decision to deny a continuance may be disturbed on appeal only for abuse of the broad discretion entrusted to it in such matters. *See Morris v. Slappy,* 461 U.S. 1, 11–12, 103 S.Ct. 1610, 1615-16, 75 L.Ed.2d 610 (1983); *United States v. Brown,* 821 F.2d 986, 988 (4th Cir.1987). We do not review the court's decision *de novo,* but instead must determine only whether the court had before it sufficient evidence to support the exercise of its discretion. *Id.; United States v. Zannino,* 895 F.2d 1, 13 (1st Cir.), *cert. denied,* 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990).

■ More than sufficient evidence supported the court's findings that Moore was capable both of assisting in his own defense and of standing trial. In response to the government's proffered evidence of his ability to assist in his defense, Moore's counsel conceded that Moore had actively participated in readying his defense by contacting and interviewing witnesses, preparing documents, and working closely with his lawyers. Indeed, it was admitted that Moore had met with his lawyers and worked with them into the night on each of the three days before his trial began. J.A. at 115. The only evidence before the court to the contrary was a brief letter from a psychiatrist reporting that Moore was suffering from stress, anxiety, and depression of such proportions that his

concentration and attentiveness were impaired and that medication had been prescribed. The psychiatrist's opinion that Moore was unable to participate meaningfully in his defense was, however, completely belied by Moore's admitted efforts in preparing for the trial. While it was no doubt true that Moore, facing trial on serious charges, was anxious and depressed, the court's conclusion that he was nonetheless capable of assisting in his defense and testifying on his own behalf was adequately supported by the evidence in the record. *See United States v. Alexander,* 869 F.2d 808, 811 (5th Cir.1989) (continuance properly denied where defendant suffered from acute anxiety, but had no disease or defect which would prevent him from testifying or assisting in his defense), *cert. denied,* 493 U.S. 1069, 110 S.Ct. 1110, 107 L.Ed.2d 1018 (1990).[1] This conclusion was borne out by the court's observations during the first day of trial that, notwithstanding a need for frequent urination that ultimately prompted Moore to have himself catheterized, Moore did not appear to be in any acute distress and consulted with his counsel throughout the proceedings. *See* R. at 256, Vol. 2; *id.* at 2–3, Vol. 5.

There was likewise no evidence that the medical or psychological consequences of proceeding with trial would be out of the ordinary or substantially endanger Moore's life. Although the cardiologist's letter and the statements of his attorney established that Moore suffered from some heart disease, there was no evidence other than the speculation of his psychiatrist that his condition was so serious that the pressures of trial would "pose a substantial danger to [his] life or health." *Brown,* 821 F.2d at 988. The district court did not abuse its discretion by denying Moore's request for a continuance.[2]

---

1. Other courts have upheld denials of continuances in circumstances far more grave than those established here. *See, e.g., United States v. Costello,* 760 F.2d 1123, 1129 (11th Cir.1985) (refusal to continue sentencing hearing not an abuse of discretion even though defendant, who was acting as his own counsel, had attempted suicide that morning and had been treated with Valium).

2. Moore also contends that the district court erred by denying him an opportunity for an evidentiary hearing. The record shows, however, that on the morning of trial the court entertained argument on the motion and examined all the evidence that Moore submitted. *See* J.A. at 99–118. We therefore understand Moore's contention to be not that the court erroneously denied him an opportunity to present evidence, but that the court erred by refusing to postpone the trial in order to allow him to present more evi-

## III.

■ Moore also challenges two of the district court's evidentiary rulings. He claims that the court admitted evidence of Moore's 1993 bankruptcy for an improper purpose, *see* Fed.R.Evid. 404(b); and impermissibly excluded impeachment evidence as unnecessarily cumulative, *see* Fed.R.Evid. 403, and as hearsay, *see* Fed.R.Evid. 802. A district court's evidentiary rulings are entitled to substantial deference and will not be reversed absent a clear abuse of discretion. *See United States v. Russell,* 971 F.2d 1098, 1104 (4th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1013, 122 L.Ed.2d 161 (1993). We will find that discretion to have been abused only when the district court acted "arbitrarily or irrationally." *United States v. Ham,* 998 F.2d 1247, 1252 (4th Cir.1993).

### A.

■ In its opening statement, the defense stated that Moore was an honest man and explained that it would "present some character witnesses about his general reputation and honesty in the community." J.A. at 401. It then called a number of character witnesses who described Moore as honest and trustworthy in his personal and business dealings. *E.g., id.* at 406 (Frank Vanderhayden); *id.* at 410 (James C. Love); *id.* at 448 (Irving A. Dow).[3] Over objection, the district court allowed the government to question one of those witnesses, James C. Love, about Moore's 1993 bankruptcy. The government elicited testimony from Love, who had been Moore's attorney and had become one of his creditors, that Moore had declared bankruptcy and defaulted on loans from five or six banks totaling hundreds of thousands of dollars. *See id.* at 437–38. Moore contends that this evidence of his bankruptcy was inadmissible under Fed.R.Evid. 404(b) as it was probative only of his character.

Evidence of a defendant's character, while not generally admissible, may be offered by the government to rebut character evidence introduced by the accused. Fed.R.Evid. 404(a)(1). Here, at defense counsel's prompting, several witnesses testified to Moore's trustworthiness in business, stating, for example, that they would have no hesitation entering into business with him, J.A. at 406, and that they had considered him a trustworthy borrower, *id.* at 342. Once Moore introduced evidence of his trustworthiness and dependability in business matters, his claim to possession of those traits was open to rebuttal by the government under Rule 404(a)(1), either by direct testimony of reputation, or, as here, by inquiry on cross-examination into relevant instances of conduct, *see* Fed.R.Evid. 405(a). *See, e.g., United States v. Jordan,* 722 F.2d 353, 359 (7th Cir.1983); *see also Michelson v. United States,* 335 U.S. 469, 479, 69 S.Ct. 213, 220, 93 L.Ed. 168 (1948). Given that Moore had "opened the door" by soliciting favorable opinions about his character, the district court properly allowed the government to rebut the offered testimony.

### B.

■ Moore also complains that the district court refused to admit into evidence an investigative report, compiled in connection with Legg's bankruptcy, which related the statement of Anthony Bonet. In that report, the bankruptcy examiner wrote:

dence. Since the evidence before the court fell short of suggesting even a substantial possibility that Moore was unable to assist in his defense or incapable of standing trial, we conclude that the district court did not abuse its discretion. *See United States v. Schroeder,* 902 F.2d 1469, 1471 (10th Cir.) (district court did not err by refusing to question defendant where defense had failed to proffer evidence of defendant's incompetence), *cert. denied,* 498 U.S. 867, 111 S.Ct. 181, 112 L.Ed.2d 145 (1990); *United States v. Bernstein,* 417 F.2d 641, 643 (2d Cir.1969) (court did not abuse its discretion by refusing to hold an evidentiary hearing where the only evidence before the court showed that the defendants were able

to stand trial); *cf. Latham v. Crofters, Inc.,* 492 F.2d 913, 915 (4th Cir.1974) (where only evidence before the court suggested a substantial possibility that trial would endanger the defendant's life, court should have afforded defendant an opportunity to offer additional proof).

**3.** The defense also elicited from several of the government's witnesses favorable testimony concerning Moore's character for honesty and trustworthiness in business. *See id.* at 274 (Michael Thompson); *id.* at 309 (A.J. Albanese); *id.* at 342 (Hugh Patterson).

In regards to the tax returns, Bonet stated that Brandt Legg disguised his handwriting in filling out some reports and that he (Bonet) typed some of them as dictated by Brandt Legg. J.A. at 498. On recross-examination, while questioning Legg about having forged documents, defense counsel read the relevant portion of the report to Legg verbatim. *See* J.A. at 187–88. Legg conceded that the examiner might have written that Bonet had said that Legg had disguised his handwriting, but he specifically denied ever disguising his handwriting other than on the two occasions he had previously admitted. *See id.* at 188. The district court denied defense counsel's subsequent motion to admit the report on the grounds that it was both hearsay and cumulative.

Except for evidence of conviction of a crime as provided in Rule 609, extrinsic evidence of specific instances of conduct may not be used to impeach a witness' credibility. Fed.R.Evid. 608(b); *United States v. Bynum,* 3 F.3d 769, 772 (4th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1105, 127 L.Ed.2d 416 (1994). "A cross-examiner may inquire into specific incidents of conduct, but does so at the peril of not being able to rebut the witness' denials." *Id.* Here, seeking to impeach Legg's credibility by suggesting that it was he who had prepared the fraudulent tax returns and that his testimony inculpating Moore was untrue, the defense asked Legg if he had ever disguised his handwriting in filling out tax forms. Legg denied that he ever had. The court's refusal to admit the report into evidence for the purpose of impeaching Legg by extrinsic evidence was wholly proper.

 Additionally, Bonet's statement, as related by the bankruptcy examiner's report, was inadmissible hearsay. Even assuming that the report itself fell within the public records exception to the hearsay rule, Fed. R.Evid. 803(8), Bonet's statement to the examiner, which was contained in that report, is hearsay and inadmissible unless some exception to the hearsay rule applies. *See*

Fed.R.Evid. 802. Neither of the two exceptions advanced on appeal is applicable. Since the district court specifically found that there were insufficient guarantees of trustworthiness attending Bonet's statement, *see* J.A. at 419, the catch-all exception, *see* Fed.R.Evid. 803(24), cannot apply. And, assuming Bonet's statement can be understood to have potentially exposed him to criminal liability, it was not shown that he was unavailable, *see* Fed.R.Evid. 804(a), as required as a precondition for application of the statement against penal interest exception, *see* Fed.R.Evid. 804(b)(3). Furthermore, since the relevant portion of the report had already been read verbatim in the presence of the jury and identified as coming from the bankruptcy report, *see* J.A. at 188, it lay within the discretion of the district court to exclude the report as cumulative. *See* Fed.R.Evid. 403.

### IV.

In November 1988, Moore sold the six condominiums he had purchased with the fraudulently obtained funds and, at settlement, received a check for approximately $37,000, which he then deposited in a federally insured bank. He was convicted under 18 U.S.C. § 1957 of engaging in a monetary transaction—the deposit—in property derived from bank fraud.[4]

### A.

Moore contends first that his conviction under section 1957 violates the *ex post facto* clause of the Constitution, U.S. Const. Art I, § 9, cl. 3. Section 1957 was enacted on October 27, 1986, after Moore had obtained the loans and purchased the condominiums, but well before he sold them and deposited his proceeds in the bank. According to Moore, by making criminal the deposit of the money he earned from the sale of the condominiums, section 1957 restricted his ability to sell lawfully the condominiums which he had purchased before the section was enacted, thereby violating the *ex post facto* clause. We disagree.

---

4. Section 1957(a) prohibits "knowingly engag[ing] ... in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity...."

In order to violate the *ex post facto* prohibition, a law "must be retrospective, that is it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." *Weaver v. Graham,* 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981) (footnotes omitted). "A law is retrospective if it 'changes the legal consequences of acts completed before its effective date.'" *Miller v. Florida,* 482 U.S. 423, 430, 107 S.Ct. 2446, 2451, 96 L.Ed.2d 351 (1987) (quoting *Weaver,* 450 U.S. at 31, 101 S.Ct. at 965.). As the Supreme Court recently explained, the *ex post facto* prohibition is violated only by an application of a statute

> which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with a crime of any defense available according to law at the time when the act was committed.

*Collins v. Youngblood,* 497 U.S. 37, 42-43, 110 S.Ct. 2715, 2719, 111 L.Ed.2d 30 (1990) (quoting *Beazell v. Ohio,* 269 U.S. 167, 169, 46 S.Ct. 68, 68, 70 L.Ed. 216 (1925)).

Application of section 1957 to Moore's transaction simply does not meet this standard. The monetary transaction in criminally derived property for which Moore was convicted—the deposit—followed section 1957's effective date by more than two years. Although the property was acquired before section 1957 made subsequent transactions in the property illegal, the criminal acts for which Moore is being punished were committed after that date. *Cf. United States v. Porter,* 909 F.2d 789, 793 (4th Cir.1990) (*ex post facto* clause not violated by application of Sentencing Guidelines to conviction for laundering money that had been amassed prior to Guideline's effective date). In short, the transaction for which Moore was convicted was illegal under section 1957 when that transaction was consummated. And, while the enactment of section 1957 prospectively restricted Moore's ability to dispose of the condominiums he had lawfully purchased, it did not retrospectively make having purchased or owned them punishable as crimes. Moore's conviction under section 1957 does not, therefore, violate the *ex post facto* prohibition.

### B.

Moore next contends that insufficient evidence supported his conviction under section 1957. Specifically, he argues that the evidence failed to exclude the possibility that the $37,000 was the equity he had previously held in the parcels of land that he had used, along with the fraudulently obtained funds, to buy the condominiums. Those fraudulently obtained funds, he maintains, were repaid in their entirety to the banks at the closing, leaving him only his legitimate equity.

Section 1957 prohibits "monetary transaction[s] in criminally derived property." "Monetary transaction" is defined to mean "the deposit, withdrawal, transfer, or exchange ... of funds or a monetary instrument ... by or through a financial institution," *see* 18 U.S.C. § 1957(f)(1), and "criminally derived property" is defined as "any property constituting, or derived from, proceeds obtained from a criminal offense," *see id.* § 1957(f)(2). Thus, the government has the burden of proving that the funds or monetary instruments used in a transaction either themselves constitute, or are derived from, the proceeds of specified criminal activity.

To satisfy this burden where the funds used in the particular transaction originated from a single source of commingled illegally-acquired and legally-acquired funds or from an asset purchased with such commingled funds, the government is not required to prove that no "untainted" funds were involved, or that the funds used in the transaction were exclusively derived from the specified unlawful activity. *See United States v. Johnson,* 971 F.2d 562, 570 (10th Cir.1992); *cf. United States v. Jackson,* 935 F.2d 832, 840 (7th Cir.1991) (18 U.S.C. § 1956 does not require the government to prove origin of funds drawn from bank account containing commingled funds). Money is fungible, and when funds obtained from unlawful activity have been combined with funds from lawful activity into a single asset, the illicitly-acquired funds and the legitimately-acquired

funds (or the respective portions of the property purchased with each) cannot be distinguished from each other, *see Johnson*, 971 F.2d at 570; that is, they cannot be traced to any particular source, absent resort to accepted, but arbitrary, accounting techniques, *see United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1159–60 (2d Cir.1986) (drug proceeds commingled with legitimate funds are potentially traceable through the "first-in, first-out," pro rata "averaging," and "first-in, last-out" methods). As a consequence, it may be presumed in such circumstances, as the language of section 1957 permits, that the transacted funds, at least up to the full amount originally derived from crime, were the proceeds of the criminal activity or derived from that activity. *See Johnson*, 971 F.2d at 570; *cf. Jackson*, 935 F.2d at 840 (section 1956 does not require tracing of origin of funds in bank account containing legitimate and illegitimate monies to determine which funds were used for each transaction); *United States v. Blackman*, 904 F.2d 1250, 1257 (8th Cir.1990) (section 1956 does not require tracing of transacted property to a particular drug sale); *United States v. Heath*, 970 F.2d 1397, 1403–04 (5th Cir. 1992) (government need not trace tainted funds through each interstate transfer from bank account even though the account also contained untainted funds exceeding the amount of individual transfers), *cert. denied*, —— U.S. ——, 113 S.Ct. 1643, 123 L.Ed.2d 265 (1993). A requirement that the government trace each dollar of the transaction to the criminal, as opposed to the non-criminal activity, would allow individuals effectively to defeat prosecution for money laundering by simply commingling legitimate funds with criminal proceeds. *Johnson*, 971 F.2d at 570; *Jackson*, 935 F.2d at 840.[5]

 Applying this standard and viewing the evidence in the light most favorable to the government, *see Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir.1982), the evidence

was sufficient for the jury to find that the $37,000 which Moore deposited constituted criminally derived property. The evidence showed that Moore purchased the condominiums with $926,000 he had obtained by bank fraud and three legitimate properties estimated to be worth $100,000. The overwhelming bulk of the purchase money for the condominiums, which Moore would otherwise have been unable to acquire, was thus criminally derived. From this, the jury was entitled to conclude, as it did, that when the condominiums were eventually sold, the net proceeds of that sale were in their entirety property derived from or developed out of the proceeds of Moore's bank fraud. *Cf. Jackson*, 935 F.2d at 840.

## V.

Moore was also convicted under 18 U.S.C. § 1001 for making a false statement to federal investigators when questioned about his role in preparing Brandt Legg's fraudulent income tax returns. He challenges the sufficiency of the evidence supporting this conviction, arguing that his statement was no more than an exculpatory denial and as such does not fall within section 1001's prohibition.

Section 1001 provides, in pertinent part:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully ... makes any false, fictitious or fraudulent statement or representation ... shall be fined not more than $10,000 or imprisoned not more than five years, or both.

*Id.* As criminal investigations are clearly matters within the jurisdiction of federal law enforcement agencies, *see United States v. Rodgers*, 466 U.S. 475, 479, 104 S.Ct. 1942, 1946, 80 L.Ed.2d 492 (1984), the broad language of this statute would seem to prohibit making "any" false statement to federal agents investigating a crime. However, concerned by section 1001's expansive sweep and by applications of the statute which, although

---

5. The jury was instructed, with the defense's consent, *see* R. at 168–69, Vol. 4; Def.'s Proposed Jury Instruction No. 22 (as amended), that "[t]he government is not required to trace the property it alleges to be proceeds of specified

unlawful activity to a particular underlying offense. It is sufficient if the government proves that the property was the proceeds of specified unlawful activity, generally."

they do not touch it, *see United States v. Steele*, 933 F.2d 1313, 1320–21 (6th Cir.) (*en banc*), *cert. denied*, —— U.S. ——, 112 S.Ct. 303, 116 L.Ed.2d 246 (1991); *United States v. Rodriguez–Rios*, 14 F.3d 1040 (5th Cir.1994) (*en banc*); *cf. United States v. Dunnigan*, —— U.S. ——, ——, 113 S.Ct. 1111, 1117, 122 L.Ed.2d 445 (1993) ("a defendant's right to testify does not include the right to commit perjury"), are "uncomfortably close to the Fifth Amendment," *United States v. Lambert*, 501 F.2d 943, 946 n. 4 (5th Cir.1974) (*en banc*), courts have created an exception to section 1001 for exculpatory answers to questions posed by federal criminal investigators.

■ This circuit has embraced the "exculpatory no" doctrine and excluded from section 1001's ambit denials of guilt made in response to the inquiries of federal officers conducting criminal investigations. *United States v. Cogdell*, 844 F.2d 179, 183 (4th Cir.1988). In *Cogdell* we adopted, by a divided panel, the Ninth Circuit's five-factor test which excepts a false statement from section 1001's reach when:

(1) it was not made in pursuit of a claim to a privilege or a claim against the government;

(2) it was made in response to inquiries initiated by a federal agency or department;

(3) it did not pervert the basic functions entrusted by law to the agency;

(4) it was made in the context of an investigation rather than of a routine exercise of administrative responsibility; [and]

(5) it was made in a situation in which a truthful answer would have incriminated the declarant.

*Id.* (adopting test articulated in *United States v. Medina de Perez*, 799 F.2d 540, 544 & n. 5 (9th Cir.1986)); *see also United States v. Equihua–Juarez*, 851 F.2d 1222, 1224 (9th Cir.1988). Since the factors of this test are listed in the conjunctive, failure to satisfy any one of them renders the narrow "exculpatory no" exception inapplicable. *United States v. Becker*, 855 F.2d 644, 646 (9th Cir.1988).[6]

While the "exculpatory no" doctrine insulates simple denials of guilt from the reach of section 1001, it is clear that under *Cogdell*'s reasoning, not every attempt at self-exoneration is encompassed by this doctrine. The third prong of our test requires that the false statement "not pervert the basic functions entrusted by law to the agency." *Cogdell*, 844 F.2d at 183. Although the investigation of crimes is undoubtedly a basic function of federal law enforcement agencies, *see Rodgers*, 466 U.S. at 479, 104 S.Ct. at 1946, we concluded in *Cogdell* that a "false denial of guilt does not pervert the investigator's function in the manner the statute was intended to combat." 844 F.2d at 184. A competent investigator, we said, "cannot be overly surprised when a suspected criminal fails to admit guilt" and cannot be expected to abandon his investigation when a suspect makes exculpatory statements. *Id.* "A false denial of guilt … is merely one of the ordinary obstacles confronted in a criminal investigation." *Id. See also Medina de Perez*, 799 F.2d at 546.[7] On this reasoning, we held that *Cogdell*'s denial that she committed the crime for which she was under investigation was an "exculpatory no" exempt from section 1001's reach. *Cogdell*, 844 F.2d at 185. We thereby adopted a limited "exculpatory no"

---

**6.** Besides our own, only the Eighth Circuit has adopted the Ninth Circuit's five-factor test articulated in *Medina de Perez*, 799 F.2d at 544 & n. 5. *See United States v. Taylor*, 907 F.2d 801, 804 (8th Cir.1990). However, four other circuits have adopted the "exculpatory no" doctrine in some form. *See United States v. Tabor*, 788 F.2d 714, 717–19 (11th Cir.1986); *United States v. Fitzgibbon*, 619 F.2d 874, 879–80 (10th Cir. 1980); *United States v. King*, 613 F.2d 670, 674–75 (7th Cir.1980); *United States v. Chevoor*, 526 F.2d 178, 184 (1st Cir.1975), *cert. denied*, 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976).

The Fifth Circuit, which was the first to accept the "exculpatory no" doctrine, *see Paternostro v.*

*United States*, 311 F.2d 298, 305 (5th Cir.1962), recently discarded the doctrine as inconsistent with the plain language of section 1001 and unwarranted by Fifth Amendment concerns, *see Rodriguez–Rios*, 14 F.3d 1040.

**7.** Some courts have observed that under this reasoning, false denials of guilt may be immaterial and thus outside the scope of section 1001 regardless of the operation of the "exculpatory no" doctrine. *See Steele*, 933 F.2d at 1321 n. 7; *United States v. Alzate–Restreppo*, 890 F.2d 1061, 1068 (9th Cir.1989) (Patel, J., and Nelson, J., concurring in judgment).

exception for denials of knowledge or participation in criminal conduct.[8]

■ This narrow exception to section 1001's plain language, however, does not extend to misleading exculpatory stories or affirmative statements other than simple denials of the criminal act that divert the government in its investigation of criminal activity. *See also United States v. Bakhtiari*, 913 F.2d 1053, 1061–62 (2d Cir.1990) (even if adopted, doctrine would be inapplicable to any statement beyond a simple "no"); *United States v. Capo*, 791 F.2d 1054, 1069 (2d Cir.1986) (same), *vacated in part on other grounds*, 817 F.2d 947 (2d Cir.1987) (*en banc*); *United States v. Duncan*, 693 F.2d 971, 976 (9th Cir.1982) (doctrine inapplicable where defendant did not merely say no, but offered affirmative statements), *cert. denied*, 461 U.S. 961, 103 S.Ct. 2436, 77 L.Ed.2d 1321 (1983); *United States v. Moore*, 638 F.2d 1171, 1175–76 (9th Cir.1980) (same); *United States v. King*, 613 F.2d 670, 674 (7th Cir.1980) ("doctrine is limited to simple negative answers ... without affirmative discursive falsehood"); *Paternostro v. United States*, 311 F.2d 298, 305 (5th Cir.1962) (doctrine applies to "mere negative responses to questions propounded ... by investigating agent"); *United States v. Chevoor*, 526 F.2d 178, 184 (1st Cir.1975) ("negative, oral responses to the questioning .... were not statements' within the meaning of 18 U.S.C. § 1001").

Unlike mere denials that one committed a particular act, such statements, particularly ones tending to inculpate others, impair the basic functions of a law enforcement agency by diverting scrutiny and investigative efforts to others. The Ninth Circuit has opined that there is no "meaningful distinction between an exculpatory 'no, I am not guilty,' and a more complete, evasive exculpatory response to a direct question," *Medina de Perez*, 799 F.2d at 546 n. 9, and has excepted even elaborate exculpatory tales from section 1001's reach, *see, e.g., id.* at 547; *United States v. Myers*, 878 F.2d 1142 (9th Cir.1989). However, such an expansive view of the "exculpatory no" exception is, we believe, unwarranted by our precedents.[9] And given the thin textual and constitutional foundations of the "exculpatory no" doctrine, *see Rodriguez–Rios*, 14 F.3d 1040; *Steele*, 933 F.2d at 1320–21; *Cogdell*, 844 F.2d at 185–87 (Wilkins, J., dissenting in part); *cf. Dunnigan*, — U.S. —, 113 S.Ct. 1111, we decline to expand this circuit's "exculpatory no" exception beyond the holding of *Cogdell;* that is, to except more than false denials of guilt from section 1001's coverage.

■ Moore contends that the evidence adduced at trial was insufficient to show that his statement to the investigators was anything other than a "classic exculpatory no." Appellant's Br. at 49.[10] The evidence of Moore's statements to the government inves-

---

8. It is plain the substance of Cogdell's statements to the Secret Service agent was simply to deny having committed any criminal act, *see id.* at 180, although their exact content is unclear.

9. Despite our adoption of the *Medina de Perez* test, our understanding of the "exculpatory no" exception described therein has been relatively constrained. *Compare United States v. Holmes*, 840 F.2d 246, 249 & n. 4 (4th Cir.) (defendant's use of false name when arrested for illegal gambling did not meet *Medina de Perez*'s requirements since determination of identity was a routine administrative task and admission of his real name was not incriminating *per se*, but would only have potentially exposed him to a higher sentence), *cert. denied*, 488 U.S. 831, 109 S.Ct. 87, 102 L.Ed.2d 63 (1988), *with Equihua–Juarez*, 851 F.2d at 1225–27 (defendant's use of false name when arrested by the Border Patrol for illegal entry met *Medina de Perez*'s requirements since determination of identity was an investigative task, admission of his real name would have

been incriminating, and use of a false name did not pervert the Border Patrol's law enforcement functions).

10. Moore also contends that the indictment raised the "exculpatory no" defense on its face, and as such failed to charge him with a crime. The indictment averred that when shown three of the fraudulent income tax returns he had prepared for Brandt Legg,

> the defendant, JERRY A. MOORE, falsely and fraudulently stated he had not prepared the same and falsely and fraudulently stated that his handwriting did not appear on the same and affirmatively volunteered that he had no role in the preparation of tax returns of financial statements for Brandt H. Legg and, further, that he had no role in any of Legg's financial dealings....

J.A. at 37. For the reasons stated, *infra*, we find that the indictment charged Moore with affirmative false statements falling outside the "exculpatory no" exception.

tigators consisted of the testimony of Postal Inspector Addison and Moore's former attorney, James C. Love. Addison testified that after being shown copies of Brandt Legg's fraudulent individual and corporate tax returns, Moore denied preparing them, J.A. at 194–95, and stated that his handwriting did not appear on the documents, *id.* at 195. According to Addison, Moore further stated that he had not prepared any tax returns or financial statements for Legg. *Id.* Love confirmed Addison's testimony, testifying that Moore had admitted that the handwriting on the documents was similar in appearance to his, but then told the investigators that it was not in fact his, R. at 58, Vol. 4, and that he had never prepared the type of corporate income tax form on which it appeared, *id.* at 59. Viewing the evidence in the light most favorable to the government, *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789, and according the government the benefit of all reasonable inferences from that evidence, *Tresvant,* 677 F.2d at 1021, we conclude that a rational jury could determine, as the jury here did, that Moore's statements to the federal agents were false; that those statements were other than, and went beyond mere, denials of guilt; and that they instead formed an affirmatively misleading story calculated to subvert the government's investigatory efforts.[11]

With *Cogdell* 's narrow limiting construction of section 1001 in mind, we conclude that Moore's statements, as necessarily found by the jury, do not fall within the "exculpatory no" exception to section 1001. Moore's statements, as established by the evidence adduced at trial, were not direct denials of guilt; that is, they were not negative responses to direct questions of whether Moore had been involved in or had knowledge of the criminal activities then under investigation. Moreover, they were affirmative statements designed to mislead and divert the government's investigation. Moore's statements tended not just to exculpate, but to exculpate by inculpating another, thereby misleading and perverting the investigating agents' basic

function. Accordingly, Moore's false statements fell outside the "exculpatory no" exception. We therefore affirm his conviction under section 1001.[12]

## VI.

For the reasons stated herein, the district court's judgment on Moore's convictions is affirmed.

*AFFIRMED.*

---

11. At the government's request, the jury was accurately instructed on the "exculpatory no" doctrine. *See* R. at 33–34, Vol. 5.

12. Moore raises numerous other assignments of error. Having carefully examined these contentions, we find them to be without merit.