53 F.3d 329
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Benancio CEPEDA, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Ameer Ali SHAKOOR, Defendant-Appellant.
 Nos. 94-5301, 94-5302.
 United States Court of Appeals, Fourth Circuit.
 Argued Feb. 2, 1995.
Decided May 2, 1995.
 
 Before POWELL, Associate Justice (Retired), United States Supreme Court, sitting by designation, WILKINS, Circuit Judge, and BUTZNER, Senior Circuit Judge.
 OPINION
 BUTZNER, Senior Circuit Judge:
 
 
 1
 Benancio Cepeda and Ameer Ali Shakoor were each convicted of conspiracy to distribute cocaine and distribution of cocaine. Shakoor was also convicted for carrying a firearm in conjunction with a drug trafficking crime. On appeal they raise numerous issues, four of which merit discussion. They contend that the trial judge deprived them of a fair trial through improper questioning and comments. They also argue that the judge erred when he refused to advise the jury that a government witness had been coached by a member of the courtroom audience. Cepeda maintains that the court erred by unduly restricting testimony about his background. Finally, they assert that during sentencing the court erred in his determination of the amount of cocaine base. We affirm the judgments of guilt based on the verdicts of a jury but remand for resentencing.
 
 
 2
 * The appellants were charged, along with Marlo Evans and Conwell M. Edlow, Jr., in a multicount indictment alleging various drug trafficking offenses. The government prosecuted on the theory that Cepeda was the leader of the drug conspiracy, Shakoor was his assistant, and Evans, Edlow and other unindicted coconspirators were the distributors. Evans and Edlow pled guilty and agreed to cooperate with the government in the prosecution of Cepeda and Shakoor.
 
 
 3
 Evans testified that Cepeda provided him with crack cocaine on consignment. When Cepeda was unavailable, Shakoor supplied the cocaine. Evans also testified that Edlow approached him and purchased an ounce of crack. Edlow later asked to purchase larger quantities and Evans introduced him to Cepeda and Shakoor.
 
 
 4
 Edlow was contacted by Gregory Mack, an undercover agent who wanted to purchase two ounces of cocaine. Edlow testified that he used a pager provided by Cepeda, placed an order for the cocaine, and received a drug delivery for Mack from Cepeda and Shakoor. Mack later purchased two more ounces from Edlow using marked currency. Following this last transaction, Cepeda and Shakoor were arrested. Agents seized marked currency from both Cepeda and Shakoor.
 
 
 5
 The jury convicted both defendants of conspiracy. It convicted Shakoor on two counts of distribution and on the gun charge. It convicted Cepeda on one count of distribution and acquitted him on another count of distribution. The district court sentenced Cepeda to life imprisonment. The court sentenced Shakoor to 352 months imprisonment.
 
 II
 
 6
 During the course of the five-day jury trial, the judge frequently questioned the witnesses. The most extensive interrogation involved Shakoor and covered 20 pages in the trial transcript. In particular, the appellants complain about the following questions:
 
 
 7
 THE COURT: Where did you go to work after you left the non-commissioned officers' club, February 1st, 1992? You met Mr. Cepeda. Where did you go to work?
 
 
 8
 SHAKOOR: During that time I was a full time student.
 
 
 9
 THE COURT: What school? SHAKOOR: Commonwealth College, sir.
 
 
 10
 THE COURT: What courses were you taking at Commonwealth College?
 
 
 11
 SHAKOOR: Studying industrial electronics.
 
 
 12
 THE COURT: What courses did you take? Name the five or six courses as a full time student that you took that year and tell me the grades?
 
 
 13
 SHAKOOR: Personal computer repair. Solid state electronics.
 
 
 14
 THE COURT: You took this in when, beginning when?
 
 
 15
 SHAKOOR: I started Commonwealth College in June 1991, sir.
 
 
 16
 THE COURT: So you were a full time student in June 1991?
 
 
 17
 SHAKOOR: That is correct.
 
 
 18
 THE COURT: Until when?
 
 
 19
 SHAKOOR: Until May, 1993. I believe it was--no. Not May. Until the spring of 1993. At that time I became a part time student.
 
 
 20
 THE COURT: Until the spring of 1993?
 
 
 21
 SHAKOOR: That is correct.
 
 
 22
 THE COURT: Now, this Commonwealth College is located where?
 
 
 23
 SHAKOOR: Their main campus in Virginia Beach was--I attended Hampton campus in Hampton.
 
 
 24
 THE COURT: Hampton campus. You mean Tidewater Community College?
 
 
 25
 SHAKOOR: No, sir. Commonwealth College. Located in Riverdale Plaza in Hampton.
 
 
 26
 THE COURT: Riverdale Plaza?
 
 
 27
 SHAKOOR: Yes, sir.
 
 
 28
 THE COURT: What time would you go to school in say the spring of 1993. You say spring. Was that January, February, March, April?
 
 
 29
 SHAKOOR: That would be from I believe the spring term ended in April.
 
 
 30
 THE COURT: Spring term ended in April 1993?
 
 
 31
 SHAKOOR: At that time I was taking day classes.
 
 
 32
 THE COURT: What were the day classes that you were taking? We are talking about in the spring, April 1993, the last time that you were a full time student. Now, what classes were you taking?
 
 
 33
 SHAKOOR: I believe that I had oral communications during that term. I believe that I had marketing management.
 
 
 34
 THE COURT: Oral communications. How many courses were you taking in April 1993? Don't you pay for any course that you take?
 
 
 35
 SHAKOOR: I was receiving financial aid. I am not sure exactly.
 
 
 36
 THE COURT: So you were getting a government grant; is that correct.
 
 
 37
 SHAKOOR: Yes, yes.
 
 
 38
 THE COURT: And did you pass everything and get As or Bs or Cs, or how did they grade?
 
 
 39
 SHAKOOR: I kept a passing grade.
 
 
 40
 THE COURT: Do you know what you got in oral communications? Just tell me. That's the last full time course you took?
 
 
 41
 SHAKOOR: I believe I received a B in oral communications.
 
 
 42
 THE COURT: B. How many hours was it?
 
 
 43
 SHAKOOR: It was three. I think it was a three credit hour course.
 
 
 44
 THE COURT: So that's speech, isn't it?
 
 
 45
 SHAKOOR: Oral communications as relates to business, sir.
 
 
 46
 THE COURT: Oral communications, you mean it doesn't teach you how to speak?
 
 
 47
 SHAKOOR: Oh, that it does, sir, yes.
 
 
 48
 THE COURT: So it is oral communications. Does it mean what it says?
 
 
 49
 SHAKOOR: Yes, sir.
 
 
 50
 THE COURT: So you have been taught how to talk to people, isn't that correct?
 
 
 51
 SHAKOOR: You could say that, sir.
 
 
 52
 THE COURT: You have had a full course in doing nothing but how to talk to people and persuade people, is that correct?
 
 
 53
 SHAKOOR: Yes.
 
 
 54
 Later the judge inquired about Shakoor's work history.
 
 
 55
 THE COURT: [Floyd] Featherstone, [owner of Sound Unlimited], employed you until when?
 
 
 56
 SHAKOOR: Approximately to the middle of June, sir.
 
 
 57
 THE COURT: Until the middle of June.
 
 
 58
 SHAKOOR: Yes, sir.
 
 
 59
 THE COURT: Then where did you go to work?
 
 
 60
 SHAKOOR: Basically around that time. I didn't work the rest of June. I went home during June.
 
 
 61
 THE COURT: You went home?
 
 
 62
 SHAKOOR: Yes, sir. My sister graduated in June and I went home.
 
 
 63
 THE COURT: Oh, now you went home. You didn't work the month of June. Now let's start in July. Where did you work in July 1993?
 
 
 64
 SHAKOOR: When I returned in July, that's basically when I began looking for new options and new employment. I only worked for Floyd once every two weeks during July.
 
 
 65
 THE COURT: So you were working for Floyd in July?
 
 
 66
 SHAKOOR: At approximately maybe one, like I said, once every two weeks, whenever he needed me, if he had two jobs.
 
 
 67
 THE COURT: In July 1993, how much money did you get from Floyd Featherstone? In July 1993. Not any other time. In July.
 
 
 68
 SHAKOOR: I would estimate, sir, between--
 
 
 69
 THE COURT: I don't want you to estimate. I want you to tell me. You ought to know. You worked for him. He must have paid you something. Did he pay you by the hour?
 
 
 70
 MR. SMITH: That's not a question now. Now you are--the Judge is incompetent to testify in this proceeding and you shouldn't make a statement to the jury.
 
 
 71
 THE COURT: Gentlemen of the jury, he is absolutely right. I shouldn't have gone that far. It is wrong of me to do that. Disregard it. My problem is in July 1993, what were your arrangements with Mr. Featherstone?
 
 
 72
 Cepeda was also questioned by the judge, though less extensively. The appellants allege that the judge's questioning conveyed to the jury his opinion that they were guilty.
 
 
 73
 Federal Rule of Evidence 614(b) specifically authorizes the court to interrogate witnesses. Of course, while interrogating a witness the judge must remember his responsibility to strive "for that atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding." Glasser v. United States, 315 U.S. 60, 82 (1942). When an attorney believes that the judge has strayed too far in questioning a witness, he must object at that time or at the next opportunity when the jury is absent. Fed.R.Evid. 614(c). This requirement is "designed to relieve counsel of the embarrassment attendant upon objecting to questions by the judge in the presence of the jury, while at the same time assuring that objections are made in apt time to afford the opportunity to take possible corrective measures." Fed.R.Evid. 614(c) advisory committee's note. The only objection was during the questioning about Shakoor's employment. In response, the judge corrected himself and gave the jury an appropriate instruction to disregard his interrogation.
 
 
 74
 No objections were made to the remaining questions, and this precludes our review of the issue on appeal. Stillman v. Norfolk & Western Ry. Co., 811 F.2d 834, 839 (4th Cir.1987). Even when appellate review is forfeited through failure to object at trial, we nonetheless will examine the record for the type of extreme prejudice which would deny a defendant his Sixth Amendment right to a fair and impartial trial. See Stillman, 811 F.2d at 839.
 
 
 75
 It would certainly have been preferable for the prosecution to have asked the questions posed by the judge. After considering the record as a whole, we find the evidence insufficient to establish that the judge denied the defendants a fair and impartial trial, as distinguished from a perfect trial, or that he usurped the function of the prosecutor. See United States v. Parodi, 703 F.2d 768, 776 (4th Cir.1983). There was no violation of the appellants' Sixth Amendment right to a fair trial.
 
 III
 
 76
 During the defendants' cross-examination of Evans, a United States Marshal informed the judge that a member of the audience was coaching Evans in his testimony. Outside of the presence of the jury, the district court questioned the man and determined that he was Dale Evans, a brother of the witness. The court allowed the defense to call Dale Evans and two others to the witness stand to testify about the gestures he had made. The court found that Dale Evans had made a gesture by holding his hands in the air but concluded that the meaning of the gesture could not be determined. The judge also admonished the audience not to signal to anyone testifying. A motion for a mistrial was made by the defense and was denied. The defense then requested that the jury be told about the gestures made to Evans by his brother, but the judge refused.
 
 
 77
 At trial, Shakoor's attorney conceded that, "[t]here [was] no evidence, as I know, to explain exactly what was meant by [the gesture]." Given the ambiguous nature of the occurrence and the overwhelming evidence against Cepeda and Shakoor, we conclude that the district court did not commit reversible error by refusing to inform the jury of the gesture. Cf. United States v. Greenwood, 796 F.2d 49, 54-55 (4th Cir.1986) (holding that the trial judge did not commit reversible error by excluding evidence of an ambiguous "thumbs up" gesture which allegedly showed bias).
 
 IV
 
 78
 When Cepeda took the stand to testify on his own behalf, the trial judge limited his counsel to three questions concerning background evidence. Cepeda responded to queries about his education, his military service and his security clearance. The court refused to allow Cepeda to answer further questions about his security clearance and his family because his counsel had exceeded the three-question limit. Cepeda argues that the court erred by restricting testimony about his background.
 
 
 79
 Federal Rule of Evidence 611(a) grants district courts the authority to exercise reasonable control over the presentation of evidence in order to control the pace of a trial. "A district court's evidentiary rulings are entitled to substantial deference and will not be reversed absent a clear abuse of discretion." United States v. Moore, 27 F.3d 969, 974 (4th Cir.1994). In the criminal context, this standard is met only when the district court acts arbitrarily or irrationally. United States v. Ham, 998 F.2d 1247, 1252 (4th Cir.1993).
 
 
 80
 The trial court did not act arbitrarily or irrationally by limiting defense counsel to three questions concerning Cepeda's background. The evidence in question was collateral, rather than directly related to the crimes charged. The record discloses that the judge did not restrict, in any way, Cepeda's ability to testify about matters directly relevant to the charges. There was no abuse of discretion in the limitation on background evidence.
 
 V
 
 81
 At the sentencing hearing for Cepeda and Shakoor, police officer Larry Minkoff testified that Cepeda brought 20 kilograms of powder cocaine into Virginia while Shakoor brought in 16 kilograms. Using information supplied by Evans he concluded that Cepeda and Shakoor converted 77.7% of their cocaine powder into cocaine base. He testified that Cepeda should be held accountable for 15.555 kilograms of cocaine base and 4.444 kilograms of cocaine powder and that Shakoor was responsible for 12.444 kilograms of cocaine base and 3.555 kilograms of cocaine powder.
 
 
 82
 On cross-examination, Minkoff acknowledged that Evans did not have first hand knowledge of the information from which the 77.7% conversion factor was derived. Rather, Evans' information came from statements made by Eric Roberts, Shakoor's predecessor in the drug conspiracy. Evans then, in turn, reported this information to Minkoff. At trial Roberts had denied making the alleged statements. Because Roberts specifically disavowed these statements at trial, the judge refused to credit the statements underlying the conversion factor.
 
 
 83
 In determining the amount of cocaine base for sentencing purposes, the court explained that it could not hold Cepeda and Shakoor responsible for "anything less than in excess of 12 kilograms of crack." Accordingly, the court found that Cepeda and Shakoor were each responsible for at least 5 kilograms of cocaine base but not more than 15 kilograms, giving each appellant a base of 40 points under the U.S. Sentencing Guidelines. The court confirmed that this determination was based on the government's calculation that Shakoor had converted 12.444 kilograms of powder into base cocaine.
 
 
 84
 The only evidence supporting the finding of 12.444 kilograms of base cocaine was the double hearsay testimony which originated with Roberts. This evidence was specifically discredited by the judge and cannot be the basis for determining the quantity of drugs. The quantity of drugs involved must be proven by a preponderance of the evidence. United States v. Gilliam, 987 F.2d 1009, 1013 (4th Cir.1993). Because the judge found that the evidence supporting the 77.7% conversion factor was not credible and no other formula was suggested, the calculation of 12.444 kilograms of cocaine base was clearly erroneous. United States v. Goff, 907 F.2d 1441, 1444 (4th Cir.1990). At oral argument, the government commendably acknowledged that the factual findings were insufficient. The sentences are therefore vacated. We remand for determination of the correct quantity for which Cepeda and Shakoor should be held accountable and for resentencing.
 
 
 85
 We find no cause for reversal in the defendants' other assignments of error.
 
 
 86
 AFFIRMED IN PART, VACATED IN PART, AND REMANDED FOR RESENTENCING