UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                     No. 97-4599

MARION BROOKS PERSON,
Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
James C. Fox, District Judge.
(CR-96-140-F)

Argued: November 30, 1999

Decided: February 28, 2000

Before WILLIAMS and MICHAEL, Circuit Judges,
and HAMILTON, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Ronnie Monroe Mitchell, HARRIS & MITCHELL, Fay-
etteville, North Carolina, for Appellant. John Stuart Bruce, OFFICE
OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina,
for Appellee. **ON BRIEF:** Janice McKenzie Cole, United States
Attorney, Anne M. Hayes, Assistant United States Attorney, Jane J.
Jackson, Assistant United States Attorney, Raleigh, North Carolina,
for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Marion Brooks Person appeals his conviction and sentence for conspiracy to distribute cocaine and marijuana in violation of 21 U.S.C. § 846. He argues (1) that several evidentiary rulings were erroneous, (2) that the proceedings to determine his competence were inadequate, (3) that his lawyer labored under a conflict of interest, and (4) that he was improperly sentenced. Finding no reversible error, we affirm.

I.

The government offered evidence of the following. From 1988 to 1995 Person helped members of Charles Parker's drug organization obtain drivers' licences in false names from the North Carolina Division of Motor Vehicles (DMV). Parker and some twenty others operated a North Carolina drug ring that distributed large amounts of cocaine and marijuana imported from Mexico. Parker's people needed fake identification in order to conceal their true identities from the police. In 1988 one of Parker's lieutenants, Johnny Faircloth, introduced Person to Parker as a man with "connections" at the DMV, who could get fake drivers' licenses. From that time forward, Person helped Parker and a number of his associates obtain fake licenses from the DMV. Person was well paid for his assistance, receiving anywhere from $500 to $1,000 per license. Most important, Person was told repeatedly why Parker and his cohorts needed licenses in false names: fake identification would reduce their chances of being caught. Person's help was instrumental to the success of the drug ring. Armed with the fake licenses arranged through Person, several members of the ring, including Parker himself, passed through the hands of police and local courts without detection.

Two examples illustrate the extent of Person's collaboration with Parker's organization. In the fall of 1988 Parker instructed Faircloth

2

to arrange a meeting with Person to see about getting a fake driver's license for Duane Stone, one of Parker's drug suppliers. Shortly thereafter, Parker, Faircloth, and Stone himself went to meet Person at his home. Person gave Stone a fake birth certificate and a bogus family Bible to present to the DMV as identification. In addition, Person made arrangements to influence the DMV examiner who would be asked to process Stone's bogus application: Person brought a woman to the DMV office to provide sex for the examiner, and Person instructed Parker, Faircloth, and Stone to buy steaks and liquor for the examiner. Stone was issued a driver's license in a fake name, and Person was paid $500 for his help. In the early 1990s Clyde Smith, another member of Parker's organization, arranged for Person to stop by his auto shop to discuss overall arrangements for obtaining fake drivers' licenses. At this meeting Person and Smith decided that the fake licenses would cost $2,000. Further, the two agreed that they would split the $2,000 payment for each license three ways: they would each get $800 and the DMV examiner would get $400. Smith and Person spoke openly about how the fake licenses would allow Parker's organization to elude the police. Indeed, Person bragged to Smith about the quality of the licenses; he assured Smith they would "hold up" under an arrest.

At least five members of Parker's organization, including Parker himself, testified that they used the fake licenses to avoid arrest as they carried on their drug trafficking activity. All testified that they obtained their fake licenses through Person. Finally, a search of Person's home turned up a wealth of supplies necessary to carry out the fake licensing scheme. These included blank military discharge forms, blank power of attorney forms, and blank birth certificates.

Person presented a defense. His wife, Peggy, and his daughter, Catherine Bond, testified for him as character witnesses. Both testified that Person was "highly respected" in the community. In addition, Ms. Bond said that she had never known of her father to engage in "any illegal conduct" or "in any drug activity." On cross-examination Mrs. Person admitted that Person had resigned as Clerk of the Superior Court of Cumberland County, North Carolina, after he was accused of fixing traffic tickets, and Ms. Bond admitted that her father resigned in the wake of allegations of ticket fixing. Mrs. Person and Ms. Bond both admitted knowing that Person had been arrested

3

for solicitation of a crime against nature. (Prior to trial the district court had denied Person's motion in limine to block the government from inquiring (1) about his 1979 arrest and conviction for soliciting a crime against nature and (2) about any allegations of improper conduct while he was clerk.)

Person also took the witness stand. He denied the charges and specifically denied assisting any of the government witnesses in obtaining false drivers' licenses. In addition, he claimed that he did not know that any of the government witnesses had been involved in illegal drug trafficking. Finally, he denied taking any money. On cross-examination the government asked Person about his prior arrest:

> Q: Isn't it true that you were arrested for soliciting a crime against nature?
>
> A: The record speaks for itself: Yes.
>
> Q: And that was you and another man in the park?
>
> Ms. Stubbs: Objection.
>
> The Court: The objection is overruled.
>
> The Witness: The record speaks for itself. I don't recall.

After Person testified on direct that he had resigned as Clerk of the Superior Court of Cumberland County because of "some problems," the government followed up with this cross-examination:

> Q: Mr. Person, you had to resign as the Clerk of Superior Court in Fayetteville, it is alleged that you fixed over 5,000 tickets, isn't it?
>
> A: That is absolutely false. It was 12.
>
> Ms. Stubbs: Objection.
>
> The Court: The objection is overruled.

4

At the conclusion of the trial the jury found Person guilty of one count of conspiracy to possess with intent to distribute cocaine and marijuana. Person appeals, raising several issues.

II.

Person contends that the district court erred when it allowed the government to cross-examine his character witnesses (and later Person himself) about his 1979 arrest for soliciting a crime against nature and his resignation as Superior Court Clerk of Columbia County. He raises specific objection to the implication of some of the questions on these subjects that were asked of him. He says that it was highly improper for the government to suggest that the 1979 arrest involved a homosexual encounter and that the government had no grounds to suggest that he had fixed as many as 5,000 tickets when he was clerk. Person claims that this entire line of cross-examination violated several of the Federal Rules of Evidence, including Rules 401, 403, 608, 609, and 611. The essence of Person's claim is that the evidence elicited by this questioning was so unfairly prejudicial that it should have been excluded under Rule 403 and that it violated the prohibition in Rules 608 and 609 against the use of prior bad acts or crimes to attack credibility.

Person's argument that Rules 608 and 609 govern the propriety of the character questions put to his wife and daughter by the government is misplaced. Person's wife and daughter both testified that he was highly respected in the community, and the daughter testified that, to her knowledge, he had never done anything illegal. Once Person put his character in issue through the testimony of his wife and daughter, the Federal Rules of Evidence permitted the government to ask the wife and daughter about specific instances of Person's conduct that were inconsistent with a good reputation. See Fed. R. Evid. 404 and 405; United States v. Moore, 27 F.3d 969, 974 (4th Cir. 1994). Specifically, it was proper for the government to ask the wife and daughter whether they knew about Person's prior arrest, even though it was remote in time. The daughter, after all, had testified on direct that Person had never done anything illegal. Asking the character witnesses on cross-examination whether they were aware that Person had resigned as clerk amidst allegations of ticket fixing was likewise proper because it too was relevant to the issue of character.

5

We turn to the cross-examination of Person. Even assuming it was improper to ask Person (1) whether he had been arrested for solicitation or (2) whether he resigned as Superior Court Clerk under a cloud, the information was already before the jury through the proper examination of Person's wife and daughter. It was also harmless because of the overwhelming direct evidence against Person. Person nevertheless argues that some of the details sought by the government in this line of questioning were prejudicial.

Specifically, Person asserts that the district court erred in allowing the government to ask him on cross-examination whether his 1979 arrest for soliciting a crime against nature involved him and another man. The government thus implied that Person was involved in a homosexual encounter. This was an ugly tactic that is prohibited by Fed. R. Evid. 403. See United States v. Ham, 998 F.2d 1247, 1252 (4th Cir. 1993). Moreover, whether a homosexual encounter led to Person's arrest in 1979 has nothing to do with proving that he arranged (ten or more years later) for the issuance of bogus drivers' licenses to aid a drug conspiracy. We must decide whether allowing a question that implied homosexual activity was harmless error. Again, we conclude that it was harmless because of the wall of testimonial and physical evidence against Person. As our discussion of the facts reveals, see part I, supra, several witnesses testified in detail about Person's successful efforts to obtain the fake licenses, which he knew were used to facilitate drug trafficking. Moreover, a wealth of blank documents needed to carry out the scheme were found in the search of Person's home. The strength of this evidence renders the improper question harmless.

Person also argues that he was prejudiced when the government was allowed to ask him whether he had been accused of fixing 5,000 tickets when he resigned as clerk. Person answered that he was accused of fixing twelve, although it appears that the number might have been in the hundreds. While the government has a duty to avoid suggestions that are intentionally misleading, any overstatement here did not prejudice Person in the end. As we have said, the evidence against him was overwhelming.

III.

Person contends that the district court erred when it determined he was competent and when it denied him an evidentiary hearing on the

issue. Prior to arraignment and trial the district court granted the motions filed by Person and the government to have Person examined for competency. Person's long-time family doctor submitted a report stating that Person was incompetent to stand trial. Person was examined by doctors at the Butner Federal Correctional Institution, and they found him to be competent. After a colloquy with Person and a review of the doctors' reports, the district court found him competent to enter a plea.

Person contends that once he underwent a competency evaluation the district court was required to hold an evidentiary hearing. Person simply misunderstands the relevant statutory framework. A court is required to hold a hearing only "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent." 18 U.S.C. § 4241(a). See also United States v. West, 877 F.2d 285, 285 n.1 (4th Cir. 1989). The district court found that Person was competent based on its discussion with him and its evaluation of the doctors' reports. Person did not request an evidentiary hearing at the time, and the court did not have reasonable cause to hold one.

Person also contends that the circumstances do not support the district court's finding that Person was competent. Again, this finding was based on the court's own discussion with Person as well as the doctors' reports. Moreover, when Person's lawyer reported on one occasion during trial that Person was saying some things that did not make sense, the court discussed the matter with counsel for both sides and referred again to the report from the doctors at FCI Butner, who had concluded that Person was competent. We find no error in the district court's handling of the competency issue.

IV.

Person claims that his lawyer labored under a conflict of interest that requires either a new trial or at least a hearing to determine if his defense was prejudiced by the conflict. Person's lawyer had represented one of Person's co-conspirators in an earlier trial. Prior to his trial Person signed a statement waiving any potential conflict of interest. Moreover, on two occasions before trial the district court asked Person whether he was aware that his lawyer had represented another

7

member of the Parker drug ring in an earlier case and whether Person was satisfied with his lawyer's representation. Both times, Person replied that he was aware of the prior representation and that he was satisfied with his lawyer's work. In particular, he said that she was doing "a good job." In these circumstances, we reject Person's conflict claim.

V.

Person argues that the district court erred in denying his motion for judgment of acquittal on the ground that the evidence was insufficient to prove that he knowingly joined and participated in a drug conspiracy. The district court was correct. The evidence was sufficient for the jury to conclude that Person was told that fake licenses were needed to facilitate the operation of Parker's drug ring. With this knowledge, Person became a part of the conspiracy when he began assisting its members in obtaining fake licenses.

VI.

Finally, Person alleges that the district court erred in not adjusting his sentence downward four levels pursuant to U.S.S.G. § 3B1.2(a) for being a "minimal" participant in the conspiracy. This claim is totally without merit. The court adjusted Person's sentence downward two levels pursuant to U.S.S.G. § 3B1.2(b) for being a "minor" participant. That was sufficient. His role was too important to be described as "minimal."

VII.

The judgment of the district court is affirmed.

AFFIRMED

8