**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-4450**

UNITED STATES OF AMERICA,

          Plaintiff – Appellee,

v.

TRENTON R. BIRCHETTE,

          Defendant – Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Newport News.  Arenda L. Wright Allen, District Judge.  (4:16-cr-00057-AWA-RJK-1)

Argued:  September 28, 2018                    Decided:  November 7, 2018

Before WILKINSON and HARRIS, Circuit Judges, and William L. OSTEEN, Jr., United States District Judge for the Middle District of North Carolina, sitting by designation.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Harris and Judge Osteen joined.

**ARGUED:**  Caroline Swift Platt, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellant.  Kaitlin Gratton Cooke, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.  **ON BRIEF:**  Geremy C. Kamens, Federal Public Defender, Alexandria, Virginia, Keith Loren Kimball, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Norfolk, Virginia, for Appellant.  Dana J. Boente, United States Attorney, Alexandria, Virginia,

Brian J. Samuels, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Newport News, Virginia, for Appellee.

WILKINSON, Circuit Judge:

The Supreme Court held in *Peña-Rodriguez v. Colorado* that courts may receive evidence from jurors impeaching a jury verdict after a "threshold showing" that "racial animus was a significant motivating factor in [a] juror's vote to convict." 137 S. Ct. 855, 869 (2017). After a jury convicted Trenton Birchette of several firearm- and drug-related offenses, defendant requested leave to interview jurors for evidence of racial animus. The United States District Court for the Eastern District of Virginia denied his request. Birchette now challenges that ruling and raises other evidentiary issues. For the following reasons, we affirm the conviction.

I.

The United States charged defendant Trenton R. Birchette with Possession with Intent to Distribute Cocaine and Cocaine Base under 21 U.S.C. §§ 841(a)(1), (b)(1)(C); Use of a Communication Facility under 21 U.S.C. § 843(b); Possession of a Firearm in Furtherance of Drug Trafficking under 18 U.S.C. § 924(c)(1)(A); and Possession of a Firearm by a Convicted Felon under 18 U.S.C. § 922(g)(1).

The charges stemmed from a 2015 traffic stop of a vehicle with three occupants. Birchette was in the back seat. Detective Frank Vito and his colleagues found an unloaded Beretta 950B handgun and a small digital scale with cocaine residue in the seatback pocket in front of him. They found a folding knife and a loaded magazine matching the Beretta in a jacket near him. Detectives further suspected that Birchette concealed drugs in his anal cavity based in part on their observations and in part on defendant's jailhouse phone calls, during which he implied that he was concealing drugs

3

there. The detectives obtained a search warrant and drove Birchette to the hospital for the search. While the search came up empty, detectives later found a fist-sized bag of loose and packaged crack cocaine in the law enforcement vehicle that defendant had ridden in twice—once to jail and once to the hospital. Discolorations and a hair on the bag were consistent with storage in an anal cavity.

Before the trial began, the defense informed the United States that it would attempt to impeach Detective Vito's character for truthfulness using his testimony from a past case. See Fed. R. Evid. 608(b). The United States motioned in limine to exclude the evidence. In the past case, the district court ruled that the detective's "testimony lacked sufficient detail to support a finding of reasonable suspicion to search the defendant." J.A. 49 (summarizing Opinion and Order, *United States v. Grant*, Cr. No. 4-11cr20 (E.D. Va. Aug. 5, 2011), ECF No. 17). The district court prohibited Birchette from using Detective Vito's past testimony to impeach his character for truthfulness, however, reasoning that the prior order lacked "any indication that Detective Vito was untruthful" and thus was "not probative of Detective Vito's character for truthfulness or veracity." J.A. 54.

During Birchette's trial, Detective Vito testified about the traffic stop, the subsequent search, and the ultimate discovery of narcotics in his vehicle. The defense cross-examined Detective Vito over omissions in his application for a search warrant of defendant's anal cavity. The United States sought to elicit rebuttal testimony on redirect—over defense objection—that the search warrant had included information about Birchette's prior felony conviction and prior police interactions involving cocaine.

4

The district court overruled the objection, finding that defendant had opened the door to the testimony by probing omissions from the search warrant during cross examination. Moreover, defendant had also suggested that another passenger in the vehicle with him had been involved with past wrongdoings involving drugs. The evidence of Birchette's own history with drugs rebutted the argument that the paraphernalia, firearms, or drugs in the vehicle belonged to the other passenger.

After three days of trial, the jury began deliberations. About four-and-one-half hours later, the jury returned a verdict form with guilty on one count and undecided on three others. The court gave the jury an *Allen* charge, urging them to deliberate further and reflect on the viewpoints of their fellow jurors. See *Allen v. United States*, 164 U.S. 492 (1896). Within half an hour of the *Allen* charge, a female juror asked the judge to release her from the jury without explaining why. That juror, like Birchette, was African-American. The court declined the juror's request. Eleven minutes later, the jury returned a unanimous verdict of guilty on all counts.

The district court found that, after the verdict, a male, African-American juror approached defense counsel and said: (1) he was "sorry they had to do that"; (2) "a white lady said, 'the two of you are only doing this because of race'"; and (3) "we worked it all out." J.A. 907. The court also reviewed—without making any finding on its credibility—an affidavit from a defense paralegal claiming that the juror also said that (4) a white female juror said to the two African-American jurors, "It's a race thing for you" and (5) the juror said to counsel, "I appreciate what y'all do." *Id.* at n.2. Counsel did not ask the juror any questions during this interaction per local rules of professional ethics.

5

The defendant made an *ex parte* request for leave to interview jurors based both on the first three statements above and on the female juror's request to be excused from the jury. The request was later expanded to include all five of the above statements. The district court denied the request. It found that the alleged statements involving race were "internal jury deliberations." J.A. 913. In the court's view, Birchette had not shown good cause to interview jurors because the statements "do not reflect racial bias against Defendant." *Id.* Defendant now appeals.

## II.

We first review the district court's denials of Birchette's request to interview jurors. We review these orders for abuse of discretion. *United States v. Gravely*, 840 F.2d 1156, 1159 (4th Cir. 1988). This is a deferential standard, designed primarily to correct the arbitrary exercise of authority while upholding the range of reasonable judgment calls a trial judge is well positioned to make. See, *e.g.*, *United States v. Vidacak*, 553 F.3d 344, 348 (4th Cir. 2009). As we explain below, the district court did not abuse its discretion in denying defendant's request to interview jurors in search of evidence that could be used to impeach the jury's guilty verdict.

## A.

There are good reasons for limiting the parties' interactions with jurors after the verdict. Jury service needs to come to a timely conclusion. See *Peña-Rodriguez*, 137 S. Ct. at 865, 869. It ordinarily ends, logically enough, when the jurors reach a verdict. Losing parties may have an incentive to uncover the course of deliberations with an eye to undermining the jury's conclusion. See *McDonald v. Pless*, 238 U.S. 264, 267-69

6

(1915). The judicial system, by contrast, possesses an interest in protecting the confidentiality of juror discussions and in allowing jurors to resume their normal routines. See *Tanner v. United States*, 483 U.S. 107, 118-20 (1987). The willingness of jurors to serve and to speak freely during deliberations depends on this no-impeachment principle. See *Rakes v. United States*, 169 F.2d 739, 745-46 (4th Cir. 1948). Post-verdict interrogations have at least the potential to stretch out or to turn adversarial, and thereby undermine the no-impeachment presumption.

At common law, the no-impeachment rule generally prohibited courts from receiving evidence from jurors after the verdict that described what took place in the jury room. Although several variations of the rule have developed over time, Federal Rule of Evidence 606(b)(1) best expresses the operative principle:

> During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

There are several exceptions to the no-impeachment rule through which a court can hear testimony from jurors. A juror may testify whether "extraneous prejudicial information was improperly brought to the jury's attention"; "an outside influence was improperly brought to bear on any juror"; or "a mistake was made in entering the verdict on the verdict form." Fed. R. Evid. 606(b)(2).

Over the centuries, parties have requested additional exceptions to common law and statutory no-impeachment rules. Courts have long declined to create new exceptions

7

even in extraordinary circumstances, including when jurors: (1) reached a verdict by a game of chance, *Vaise v. Delaval*, 99 Eng. Rep 944 (K.B. 1785) (discussed by *Peña-Rodriguez*, 137 S. Ct. at 863); (2) calculated damages by averaging figures, *McDonald*, 238 U.S. at 265-66 (discussed at 137 S. Ct. at 864); (3) served under the influence of drugs and alcohol, *Tanner*, 483 U.S. at 116, 125-26 (discussed at 137 S. Ct. at 866); and (4) neglected to disclose bias during *voir dire*, *Warger v. Shauers*, 135 S. Ct. 521, 529 (2014) (discussed at 137 S. Ct. 866-67). Federal Rule of Evidence 606(b) similarly reflects Congress' decision to provide only the most limited exceptions to the no-impeachment rule's prohibitions. 137 S. Ct. at 864-65.

In particular, Congress has not provided an exception for instances of racial animus. In *Peña-Rodriguez,* the Supreme Court considered whether the Sixth Amendment requires an extra-statutory exception to no-impeachment rules when "a juror comes forward with compelling evidence that another juror made clear and explicit statements indicating that racial animus was a significant motivating factor in his or her vote to convict." 137 S. Ct. at 861.

The facts in that case were compelling. After the guilty verdict in Miguel Angel Peña-Rodriguez's trial, two jurors informed counsel that "another juror had expressed anti-Hispanic bias toward" Peña-Rodriguez. *Id.* With the state court's permission, counsel assembled affidavits from those jurors recounting statements of gross racial animus. Among them, a juror reportedly stated: "I think he did it because he's Mexican"; that his law-enforcement experience proved that "Mexican men had a bravado that caused them to believe they could do whatever they wanted with women"; and "nine

8

times out of ten Mexican men were guilty of being aggressive toward women and young girls." *Id.* at 862. Faced with such evidence, the Supreme Court was moved to emphasize the "imperative to purge racial prejudice from the administration of justice." *Id.* at 867. "Permitting racial prejudice in the jury system," the Court noted, "damages 'both the fact and the perception' of the jury's role as 'a vital check against the wrongful exercise of power by the State.'" *Id.* at 868 (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)).

The Supreme Court thus held that a court may consider juror evidence of racial bias after a "threshold showing" of statements indicating that "racial animus was a significant motivating factor in the juror's vote to convict." *Id.* at 869. This was, however, a narrow holding. See *United States v. Baker*, 899 F.3d 123, 133-34 (2d Cir. 2018) (*Peña-Rodriguez* creates a "narrow exception"); *United States v. Robinson*, 872 F.3d 760, 764 (6th Cir. 2017) (exception applies "in very limited circumstances"); *Young v. Davis*, 860 F.3d 318, 333 (5th Cir. 2017) (exception applies "narrowly"). The Court did not, relevant for our purposes, say when parties must be able to interview jurors in search of such evidence. Indeed, the Court neither invalidated Peña-Rodriguez's conviction nor decided what was "the appropriate standard for determining when evidence of racial bias is sufficient to require that the verdict be set aside and a new trial be granted." *Id.* at 870. It did, however, remove the no-impeachment rule as a barrier to the consideration of Peña-Rodriguez's evidence.

There are sound reasons to read *Peña-Rodriguez* as a narrow exception. The fact that it may be a narrow holding, however, does not mean it is an unimportant one. Two significant values were at stake. The Supreme Court balanced the iniquity of racial

9

animus in the jury system against the important purposes served by the no-impeachment rule. In the course of doing so, the Court underscored the value of Federal Rule of Evidence 606(b):

> This version of the no-impeachment rule has substantial merit. It promotes full and vigorous discussion by providing jurors with considerable assurance that after being discharged they will not be summoned to recount their deliberations, and they will not otherwise be harassed or annoyed by litigants seeking to challenge the verdict. The rule gives stability and finality to verdicts.

*Id.* at 865.

The Court further remarked that accepting jury verdicts is "essential to respect for the rule of law." *Id.* at 860. Indeed, admitting impeachment evidence can "have 'dangerous consequences': 'no verdict would be safe' and the practice would 'open the door to the most pernicious arts and tampering with jurors.'" *Id.* at 864 (quoting *McDonald*, 238 U.S. at 268). For that reason, "juror testimony 'ought always to be received with great caution.'" *Id.* at 863 (quoting *United States v. Reid*, 53 U.S. (12 How.) 361 (1852)). Otherwise, courts risk undermining "both 'jurors' willingness to return an unpopular verdict' and 'the community's trust in a system that relies on the decisions of laypeople.'" *Id.* at 866 (quoting *Tanner*, 483 U.S. at 120-21).

The Court also identified other tools that protect against the scourge of racially motivated verdicts without discarding the no-impeachment rule. *Voir dire* can help identify racially biased jurors before they reach the jury. *Peña-Rodriguez*, 137 S. Ct. at 866 (citing *Tanner*, 483 U.S. at 127). Before the verdict, a host of factors—including jurors' self-reporting—may signal that the jury is biased or incompetent. *Id.* And

10

afterwards, other evidence may still be used to impeach the verdict. *Id.* In the end, these safeguards help both to keep the criminal justice system free of the taint of racial animus and to "ensure that the [*Peña-Rodriguez*] exception is limited to rare cases." *Id.* at 871.

For those reasons, the Court was careful to distinguish "statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations" from "offhand comment[s] indicating racial bias or hostility." *Id.* at 869. Evidence of the latter, standing alone, was insufficient in the Court's view to get around the no-impeachment rule. *Id*. Rather, the Sixth Amendment requires an exception to the no-impeachment rule after a threshold showing that a juror's racial bias was a "significant motivating factor" in his or her vote to convict. *Id.*

B.

Defendant does not yet attempt to impeach the jury's guilty verdict, but to gather evidence of racial bias through juror interviews. The Supreme Court recognized in *Peña-Rodriguez* that the "practical mechanics of acquiring . . . such evidence will no doubt be shaped and guided by state rules of professional ethics and local court rules." *Id.* Local rules that limit post-trial contact with jurors "seek to provide jurors some protection when they return to their daily affairs . . . ." *Id.* In this case, we consider Local Criminal Rule 24 for the United States District Court for the Eastern District of Virginia, which says:

> No attorney or party litigant shall personally, or through any investigator or any other person acting for the attorney or party litigant, interview, examine, or question any juror or alternate juror with respect to the verdict or deliberations of the jury in any criminal action except on leave of Court granted upon good cause shown and upon such conditions as the Court shall fix.

11

The question thus boils down to whether the district court abused its discretion in finding that Birchette had not shown "good cause" to interview jurors. We hold that it did not.

Defendant argues that denying the motions because of a lack of evidence of "racial bias against Defendant" was legal error. J.A. 913. We disagree. This court has previously addressed a request to interview jurors about improper outside influences on the jury. See Fed. R. Evid. 606(b)(2)(B). In that analogous context, we required a "threshold showing of improper outside influence" before a party could interview jurors. *Gravely*, 840 F.2d at 1159. Without that showing, juror interviews would have been a "mere fishing expedition." *Id.*

To show "good cause," E.D. Va. Local Crim. R. 24, and avoid fishing expeditions in the present context, a party should give a trial court sound reason to believe that interviews would uncover the kind of evidence that moved the Court in *Peña-Rodriguez*. In other words, a party must be likely to find evidence that "racial animus was a significant motivating factor in the juror's vote to convict." 137 S. Ct. at 869. The district court thus properly related the good cause standard in Local Criminal Rule 24 to the relevant standard for waiving the no-impeachment rule from *Peña-Rodriguez*. Whether that standard is met is quintessentially a judgment call for district courts.

Under that standard, the district court acted well within its discretion in finding that Birchette was unlikely to find evidence that a juror voted to convict him because of racial animus. Trial courts enjoy institutional advantages that put them in the best position to assess this question. See *Peña-Rodriguez*, 137 S. Ct. at 869 ("Whether that threshold showing has been satisfied is a matter committed to the substantial discretion of

12

the trial court . . . .”). The trial court understands courtroom dynamics in ways that cannot be gleaned from the cold transcript: it observes the jury throughout the trial, it interacts with the jury from time to time, and it conducts the *voir dire* process that ensures jury impartiality. There is thus good reason for appellate courts to hesitate before replacing the considered judgment of the trial court with their own when reviewing a ruling on juror interviews.

The Supreme Court directed trial courts to review *Peña-Rodriguez* evidence for “the content and timing of the alleged statements and the reliability of the proffered evidence.” *Id.* The district court appropriately went about this very inquiry.[1] Even accepting, *arguendo*, that all proffered evidence was reliable, none of the statements here required the district court to find that defendant would likely uncover evidence that “racial animus was a significant motivating factor in the jury’s vote to convict.” *Id*.

For example, the statement from one juror that he was “sorry they had to do that,” J.A. 907 (decision on motion for reconsideration), is the sort of thing a well-meaning juror might tell defense counsel after a guilty verdict, or that anyone might say to salve someone’s feelings after a tough loss. Trials are a competitive endeavor, but losing advocates often deserve respect for passionate advocacy all the same. Indeed, this

---

[1] We note that trial counsel made the request to interview the jurors *ex parte*. The government was unaware of the request and apparently left in the dark. Given the *ex parte* nature of the proceeding, the trial judge was appropriately cautious in the findings of fact that we review herein.

interpretation aligns with the juror's comment that he "appreciate[d]" counsels' efforts. *Id.* at 907 n.2.

Birchette also presented evidence that "a white lady" said, "the two of you are only doing this because of race" and that a juror said "[i]t's a race thing for you." *Id.* at 907 & n.2. Even assuming that the "white lady" was a juror, these statements need not suggest that the speaker's racial animus in any way impacted her vote to convict. They can reasonably be interpreted by the district court as the sort of "offhand comment[s]" that the Supreme Court held are insufficient to overcome the no-impeachment rule. *Peña-Rodriguez*, 137 S. Ct. at 869. And they certainly fall short of the statements presented in *Peña-Rodriguez*, in which a juror allegedly argued for a guilty verdict because the defendant was Mexican. *Id.* at 861-62.

The final statement presented by defendant does not assist his interview request. The juror who came forward to defense counsel said, "we worked it all out." J.A. 907. This statement followed an *Allen* charge, which in fact encourages jurors to work out disagreements on their own. And it appears that was exactly what the jury did here. Far from casting "serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict," *Peña-Rodriguez*, 137 S. Ct. at 869, this statement reflects a jury's working in the way that juries should.

Beyond those statements, Birchette argued that an African-American juror's request to be excused from the jury shortly after the *Allen* charge and shortly before the final verdict provides "good cause" to interview jurors. But that hardly required the trial

14

court to believe that one juror's request to be excused provides compelling evidence that another made clear statements reflecting a vote based on racial animus.

Nothing in the above statements therefore justifies overturning the trial court's judgment that the defendant had failed to provide good cause for the requested interviews. The district court did not abuse its discretion in ruling that juror interviews were unlikely to reveal evidence that "racial animus was a significant motivating factor in the jury's vote to convict." *Id.* The trial court was not required to take the view that it did of the evidence before it. Recognizing the importance of the standard of review, however, we hold that it was within its discretion to do so.

III.

We have reviewed the defendant's other claims of error, and we now reject them.[2] Birchette focuses on two of the district court's evidentiary rulings: (1) excluding evidence of Detective Vito's testimony in a past case and (2) admitting evidence of Birchette's prior bad acts and felony conviction. We review both evidentiary rulings for an abuse of discretion. See *United States v. White*, 810 F.3d 212, 227 (4th Cir. 2016). As noted, a district court abuses its discretion "if its decision is guided by erroneous legal principles or rests upon a clearly erroneous factual finding." *United States v. Johnson*, 617 F.3d

---

[2] We have specifically reviewed and rejected defendant's insufficiency of the evidence claims. Insufficiency claims ask the legal question whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" on the evidence viewed "in the light most favorable to the prosecution." *Musacchio v. United States*, 136 S. Ct. 709, 715 (2016) (internal quotation marks omitted). Here, the answer for each element of each count is yes, so the insufficiency claim fails.

286, 292 (4th Cir. 2010) (internal quotation marks omitted). For the reasons that follow, both evidentiary rulings were well within the district court's discretion.

A.

The district court prohibited Birchette from using evidence of Detective Vito's testimony in another case to impeach Vito's character for truthfulness. Under Federal Rule of Evidence 608(b), a court "may" allow cross-examining attorneys to inquire into specific instances of conduct only "if they are probative of the character for truthfulness or untruthfulness of . . . the witness." Fed. R. Evid. 608(b). The district court excluded evidence of Detective Vito's past testimony (*i.e.* the specific instance of conduct) because it was "not probative of [his] character for truthfulness." J.A. 54.

This was no abuse of discretion. The text of Rule 608(b) says that a court "may" allow lawyers to cross-examine about past conduct. We have emphasized the rule's discretionary nature before. See *United States v. McNatt*, 931 F.2d 251, 255 (4th Cir. 1991) (remarking that "any use of specific instances of conduct . . . is committed to the discretion of the trial court"). The trial court here appropriately read its earlier order in the *Grant* case as rejecting the legal import of the detective's honest observations, not finding his testimony to be untruthful. The mere fact that a district court disagrees with a law enforcement officer's assessment of reasonable suspicion or probable cause affords no basis for impugning the officer's integrity or opening the door to testimony about past conduct under Federal Rule of Evidence 608(b). The district court was right to spare the jury a mini-trial on the earlier *Grant* decision and keep the trial focused on the facts and charges of Birchette's case.

16

B.

The district court also admitted evidence of defendant's past felony conviction and interactions with law enforcement during Detective Vito's redirect examination. Whether or not prior bad act evidence is admissible under Federal Rule of Evidence 404(b), trial courts may admit such evidence after the opposing party has "opened the door to its admission." *United States v. McLaurin*, 764 F.3d 372, 383 (4th Cir. 2014). In those circumstances, the new evidence must be "reasonably tailored to rebut the original evidence." *United States v. Jackson*, 327 F.3d 273, 293 (4th Cir. 2003). The district court did not abuse its discretion in admitting Detective Vito's redirect testimony after defendant opened the door to its admission.

The defendant twice opened the door for the jury to hear the contested evidence.[3] First, Birchette attacked Detective Vito's credibility by arguing that he purposely misled the magistrate in order to obtain a warrant to search his anal cavity. Testimony that Detective Vito included Birchette's criminal record and past interactions with police involving cocaine in the search warrant served to counter the misimpression that the search warrant was purposefully incomplete or misleading.

---

[3] Any admission of the evidence was also harmless. Most of the evidence discussed on redirect examination had been admitted without objection at other times during the trial. Another narcotics detective had already testified to the same past interactions with the defendant (without mentioning cocaine). J.A. 194-95. Birchette also stipulated to a prior felony conviction. J.A. 861. Both pieces of evidence were properly admitted. The only unique evidence on redirect was that defendant's prior interactions with Detective Vito's partner had involved cocaine.

17

Birchette also suggested that the scale and handgun found by detectives belonged to another passenger. To support that theory, he questioned Detective Vito about another passenger's history with drugs. It was grossly misleading to suggest that another passenger owned the handgun and scale bearing cocaine residue *because* she had a history with drugs, but then to hide defendant's own history with drugs from the jury. Parties take risks in making arguments squarely rebuttable using their own prior bad acts. See J.A. 607 (trial counsel admitting, "I knew that this was a risk, but I had to do it"). Strategic risks are just that—risks, and risks that can yield rewards may also carry consequences.

## IV.

The assignments of error here go largely to discretionary calls the district court was best positioned to make. Both during and after trial, those rulings were conscientiously made, and the judgment is accordingly

*AFFIRMED*.