**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-1826**

SHEENA DORMAN; DILLON MING; B. M., by his parents, Sheena Dorman and Dillon Ming, as next friends,

Plaintiffs – Appellants,

v.

ANNAPOLIS OB-GYN ASSOCIATES, P.A.; RICHARD G. WELCH, M.D.,

Defendants – Appellees,

and

ANNE ARUNDEL MEDICAL CENTER, INC.,

Defendant.

**No. 18-1872**

SHEENA DORMAN; DILLON MING; B. M., by his parents, Sheena Dorman and Dillon Ming, as next friends,

Plaintiffs – Appellees,

v.

ANNAPOLIS OB-GYN ASSOCIATES, P.A.; RICHARD G. WELCH, M.D.,

Defendants – Appellants,

and

ANNE ARUNDEL MEDICAL CENTER, INC.,

 Defendant.

―――――――――

Appeals from the United States District Court for the District of Maryland, at Baltimore. Marvin J. Garbis, Senior U. S. District Judge.  (1:15-cv-01102-MJG)

―――――――――

Argued:  May 8, 2019                                          Decided:  June 20, 2019

―――――――――

Before AGEE, FLOYD, and THACKER, Circuit Judges.

―――――――――

Affirmed by unpublished opinion.  Judge Agee wrote the opinion, in which Judge Floyd and Judge Thacker joined.

―――――――――

**ARGUED:**  Andrew Janet, Seth Leventhal Cardeli, JANET, JANET & SUGGS, LLC, Pikesville, Maryland, for Appellants/Cross-Appellees.   Michael Evan Blumenfeld, Timothy McDevitt Hurley, NELSON MULLINS RILEY & SCARBOROUGH LLP, Baltimore, Maryland, for Appellees/Cross-Appellants. **ON BRIEF:**  Dov Apfel, JANET, JANET & SUGGS, LLC, Pikesville, Maryland, for Appellants/Cross-Appellees.

―――――――――

Unpublished opinions are not binding precedent in this circuit.

AGEE, Circuit Judge:

Appellants Sheena Dorman, Dillon Ming, and their child B.M. (collectively, the "Family") sued Annapolis OB-GYN Associates, P.A., ("Annapolis") and Richard G. Welch, M.D., (collectively, "Appellees"), alleging that Dr. Welch was negligent during B.M.'s birth, which caused nerve injury to the child. The jury returned a defense verdict for Appellees and the district court entered judgment. The Family challenges on appeal several of the district court's evidentiary rulings, and Appellees cross-appeal other evidentiary issues. For the reasons set out below, we affirm the rulings and judgment of the district court.

I.

In 2012, Dorman was pregnant with B.M. and received prenatal care from several Annapolis doctors, including Dr. Claudia Hays. Dr. Hays noted in a June 2013 examination that B.M. was "measuring big" and scheduled a Cesarean delivery ("C-section") for July 2013 in case that procedure became necessary. J.A. 1777. Another Annapolis physician, Dr. Ifeyinwa A. Stitt, examined Dorman during her last visit to Annapolis in June 2013, observed that Dorman was "[d]oing well," and indicated Dorman's preference to have a vaginal delivery "if [she] enters [into labor] spontaneously." J.A. 1777.

Later that month, Dorman experienced contractions and sought medical care at Anne Arundel Medical Center. Subsequently, she was evaluated by Dr. Welch, the Annapolis obstetrician on-call. Based on his evaluation, Dr. Welch determined "S equals

3

D," meaning that "the baby is reasonable size consistent with the dates of the mom," and decided to proceed with a vaginal delivery. J.A. 2180. The parties agreed that Dr. Welch's decision to conduct a vaginal delivery was appropriate and not a breach of the applicable standard of care.

During Dorman's labor, Dr. Welch observed a "turtle sign"—a phenomenon in which a baby's head appears and then retracts back toward the neck. This symptom signified a moderate shoulder dystocia, meaning that B.M.'s shoulders were caught above the mother's pubic bone. *See* J.A. 2188–89. To relieve the shoulder dystocia, Dr. Welch performed a medical procedure known as the McRoberts' maneuver[1] while applying traction to move the infant out of the vagina. After the delivery, B.M. was diagnosed with Erb's palsy in his left shoulder and arm, which is a paralysis of the arm caused by nerve injury.

Based on B.M.'s injury, the Family brought suit against Appellees in the district court for the District of Maryland,[2] alleging that Dr. Welch failed to observe the proper standard of care during Dorman's delivery and caused B.M.'s Erb's palsy. Specifically, the Family contended that Dr. Welch violated the standard of care by applying lateral

---

[1] According to the Family's opening argument during trial, this procedure occurs "when [doctors] lower the head of the bed and they flex the mother's knees back towards her shoulders. What this does is it widens the angle of the pelvis and will make it easier to free the shoulder and deliver the baby." J.A. 2092–93.

[2] The district court properly exercised diversity jurisdiction over this case under 28 U.S.C. § 1332(a) because, when the case was filed, members of the Family were citizens of Arkansas, the Appellees were citizens of Maryland, and the amount in controversy exceeded $75,000.

4

force and bending B.M.'s neck when he pulled B.M. out of Dorman's vagina. The Family requested a jury trial.

Before the scheduled trial, the parties filed several motions in limine seeking to exclude the opinions of the other party's expert witnesses. The Family sought to exclude Appellees' three causation experts, Drs. Michele J. Grimm, Kenneth Silver, and Stephanie Greene, all of whom would provide an opinion that the maternal forces of labor alone could have caused B.M.'s injury. For their part, Appellees moved to exclude the Family's three causation experts, Drs. Robert Allen, Fred Duboe (who was also the Family's sole standard-of-care expert) and Scott Kozin, who would all opine that Dr. Welch's negligent care resulted in B.M.'s injury. In addition, Appellees moved to exclude the Family's two damages experts, Drs. Tanya Rutherford Owen and Patricia Pacey, who intended to testify on B.M.'s lost future income and earning capacity. The district court denied the requests to exclude the opinions of either party's causation experts and Dr. Owen, but it partially granted Appellees' motion to exclude Dr. Pacey's opinion, specifically precluding her estimation of B.M.'s lost earning capacity after determining that her underlying methodology was unreliable.

Subsequently, Appellees filed another motion in limine to exclude any evidence regarding the scheduled C-section. In resolving this motion, the district court excluded "from trial any testimony or argument that a C-Section was required, including any mention of a C-Section" because the parties agreed that one had not been required. J.A. 1924. Nonetheless, for the sole purpose of impeaching Dr. Welch's credibility, the

5

district court allowed the Family to introduce evidence that a C-section had been scheduled.

The parties' evidentiary disputes continued throughout trial, and the Family challenges on appeal several of the district court's later decisions and trial conduct: First, the district court overruled the Family's objections to certain trial testimony of Drs. Hays and Stitt. Second, the court denied the Family's request to exclude certain evidence about Dr. Duboe's career history. Lastly, during the Family's cross-examination of Appellees' causation expert, Dr. Grimm, the district judge made certain comments the Family alleged were prejudicial to its case.

The parties timely filed their appeals, and we have jurisdiction under 28 U.S.C. § 1291.

II.

On appeal, the Family challenges two pre-trial and three trial evidentiary rulings of the district court: (1) the admission of Drs. Hays' and Stitt's positive opinions of Dr. Welch, (2) the admission of Dr. Duboe's career history, (3) the exclusion of evidence related to a C-section, (4) the district judge's comments during the Family's cross-examination of Dr. Grimm, and (5) the exclusion of Dr. Pacey's expert testimony regarding B.M.'s estimated lost earnings. It further argues that the district judge was prejudiced against its case throughout the trial.

We review the evidentiary rulings for abuse of discretion. *See Nease v. Ford Motor Co.*, 848 F.3d 219, 228 (4th Cir. 2017). A district court abuses its discretion when

it "makes an error of law in deciding an evidentiary question," or "its conclusion rests upon a clearly erroneous factual finding." *Id.* (internal quotation marks omitted). We address each argument in turn.

A.

The Family first argues that the district court erroneously admitted testimony from Drs. Hays and Stitt that affirmed Dr. Welch's clinical skills. Dr. Hays, whom the Family called as its witness, was asked in direct examination to evaluate Dr. Welch's clinical assessment of Dorman at the time of delivery. *See* J.A. 2535 ("[D]o you know what the words 'S equals D' means?"). In response, Dr. Hays did not criticize Dr. Welch's assessment or agree with counsel's criticism of Dr. Welch, as evidenced by the following exchange:

> [Family's counsel:] Would you agree with me that, based on your clinical assessment, the correct documentation is that S is greater than D, based on the clinical information of what the patient is telling you?
>
> [Dr. Hays:] I was not the person there when she showed up to labor and delivery, so I cannot say.

J.A. 2547.

In cross-examination of Dr. Hays, Appellees further inquired into her opinion of Dr. Welch's assessment, including whether his assessment of "S equals D" was appropriate. Dr. Hays answered that a clinician's estimate of fetal weight was "very subjective," but she "would trust Dr. Welch's assessment in any patient." J.A. 2576. The Family moved to strike Dr. Hays' answer, but the district court overruled that objection.

7

Dr. Stitt was Appellees' witness and testified about "her involvement with [Dorman]" and "[whether] she's worked with Dr. Welch and found him to be an adequate doctor." J.A. 3154. Before Dr. Stitt took the stand, the Family moved to prevent her from testifying about Dr. Welch's character and professional reputation. The court denied that motion, noting that Dr. Stitt was "going to testify, and she worked with [Dr. Welch] for x years; and he was a good doctor, she observed." J.A. 3155.

Dr. Stitt's direct-examination testimony was supportive of Dr. Welch's clinical skills. She testified that he was a "phenomenal" physician, J.A. 3156; had "excellent" clinical skills, J.A. 3175; and that "Dr. Welch has been doing this a really long time and he's actually very good at it," and "we are trained to . . . make the appropriate maneuvers in doing vaginal deliveries, and therefore, we don't bend the neck," J.A. 3184.

To rebut Dr. Stitt's testimony, the Family sought to introduce evidence of Dr. Welch's general reputation, such as "pages and pages of evidence of patients who have responded to Yelp and other reviews." J.A. 3153. The court denied the request, observing it was not relevant whether "random patients have said the opposite; they're not testifying." J.A. 3154. Nonetheless, the Family attempted to ask Dr. Stitt in cross-examination if she had any "idea what Dr. Welch's patients are saying about him." J.A. 3182. Appellees objected to this question and the court sustained the objection, ruling that the answer would be irrelevant.

The Family argues that the testimony of Drs. Hays and Stitt, which supported Dr. Welch's clinical skills, was inadmissible character evidence because it inappropriately characterized Dr. Welch as a skilled, successful physician. It also asserts that the district

8

court erroneously prevented it from using the evidence of Dr. Welch's general reputation on internet sites to rebut that evidence. Appellees respond that the testimony of Drs. Hays and Stitt was not improper character evidence because it was not intended to prove that Dr. Welch is a skilled physician. Even if the testimony were improper character evidence, Appellees contend, it was not prejudicial.

Regardless of whether the testimony of Drs. Stitt and Hays was character evidence, the district court properly admitted it because the Family opened the door by calling Dr. Hays to the stand and soliciting her opinions on Dr. Welch's clinical assessment of Dorman at the time of delivery. The Family's counsel posed a series of questions to her, attempting to draw her into criticizing Dr. Welch's medical capacity. Dr. Hays answered the questions propounded, but not as the Family wanted:

> [Family's counsel:] Would you agree with me that, based on your clinical assessment, the correct documentation is that S is greater than D, based on the clinical information of what the patient is telling you?
>
> [Dr. Hays:] I was not the person there when she showed up to labor and delivery, so I cannot say.
>
> . . . .
>
> [Family's counsel:] [B.M.] was an extremely large baby, greater than 97 percent, correct?
>
> [Dr. Hays:] Yes.
>
> [Family's counsel:] So this would be one of those cases where you agree with me it was critical for Dr. Welch to be aware of this information? Can we at least agree on that?
>
> [Dr. Hays:] It was 8 pounds when it was measured, and [Dorman] had prior delivered an 8, 13 baby.

9

[Family's counsel:] I'm not arguing with you, Doctor. All I'm asking you is can we agree that it would have been critical information for Dr. Welch to know that the baby was measuring greater than the 97 percentile?

[Dr. Hays:] To be prepared for a possible shoulder dystocia, as we always are.

J.A. 2547, 2554–55.

By inquiring into Dr. Hays' opinion of Dr. Welch's assessment, the Family opened the door to Appellees' inquiry into this subject on cross-examination:

[Appellees' counsel:] Okay. With respect to [B.M.] being a large-for-gestational-age baby, can clinicians have variance from clinician to clinician as to their estimated fetal weight?

[Dr. Hays:] Oh yes. It's a very subjective—very subjective thing, and we all may make a different assessment on that, but I would trust Dr. Welch's assessment in any patient.

J.A. 2576.

Given the scope of the Family's direct-examination, Appellees' questions and Dr. Hays' response in cross-examination were well within the "subject matter of the direct examination." Fed. R. Evid. 611(b). Because the Family solicited, albeit unsuccessfully, Dr. Hays' criticism of Dr. Welch's clinical assessment and skills, Appellees properly offered Dr. Stitt's contrasting opinion. *See United States v. Birchette*, 908 F.3d 50, 61 (4th Cir. 2018) ("Whether or not . . . evidence is admissible . . ., trial courts may admit such evidence after the opposing party has 'opened the door to its admission.'"); *United States v. Moore*, 27 F.3d 969, 974 (4th Cir. 1994) (holding that when the opposing party opened the door by soliciting favorable opinions about his character, the party may rebut the offered evidence "either by direct testimony of reputation, or . . . by inquiry on cross-

10

examination into relevant instances of conduct"). Thus, the district court did not abuse its discretion in admitting the testimony of Drs. Hays and Stitt.

We also agree with the district court's decision to exclude the evidence of Dr. Welch's general reputation on certain internet sites because it was irrelevant. "Evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Even putting aside questions of hearsay and witness qualification, Dr. Welch's general reputation does not reveal any fact "of consequence in determining the action" because it bears no connection to the sole question presented to the jury, which was whether Dr. Welch exercised the proper standard of care in delivering B.M. *Id.* Thus, the district court correctly held this evidence was irrelevant and excluded it.

Even assuming error in the foregoing evidentiary rulings, the Family fails to show that the errors were harmful. "[E]videntiary rulings are . . . subject to harmless error review." *Smith v. Balt. City Police Dep't*, 840 F.3d 193, 200 (4th Cir. 2016) (internal quotation marks omitted); *see* Fed. R. Civ. P. 61 (requiring courts to "disregard" errors that do not "affect any party's substantial rights"). An error is harmless if "it is reasonably certain that the jury was not significantly influenced by issues erroneously submitted to it." *Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 314 (4th Cir. 2012) (internal quotation marks omitted). Applying this doctrine, we have found that the alleged error was harmless when the jury's verdict "was supported by overwhelming evidence," and the correction of the error "would [not] have produced any different result." *Mullen v. Princess Anne Volunteer Fire Co.*, 853 F.2d 1130, 1135

11

(4th Cir. 1988). "[T]he party seeking reversal normally must explain why the erroneous ruling caused harm." *Shinseki v. Sanders*, 556 U.S. 396, 410 (2009).

Here, Drs. Stitt and Hays were neither side's causation or standard-of-care experts and did not testify as to whether Dr. Welch caused B.M.'s injury, which was the sole question presented to the jury. J.A. 2547 ("[Dr. Hays:] I was not the person there when [Dorman] showed up to labor and delivery . . . ."); J.A. 3175 ([Family's counsel:] Did you see him deliver [B.M.]? [Dr. Stitt:] I did not."); J.A. 3184 (preventing the Family's counsel from asking Dr. Stitt whether Dr. Welch possibly bent B.M.'s neck and caused the injury because the court observed she was "not a witness called by the defense on causation or standard of care"). Thus, we agree with Appellees that any error in the admission of their testimony was harmless because the jury's verdict was not significantly influenced by their testimony, and the exclusion of the testimony would not have "produced any different result." *Mullen*, 853 F.2d at 1135. Accordingly, we hold that the district court did not abuse its discretion in admitting the testimony of Drs. Hays and Stitt and excluding the evidence of Dr. Welch's general reputation.

B.

The Family next contends the district court erred in admitting evidence of Dr. Duboe's career history. Dr. Duboe is an obstetrician-gynecologist and the Family's sole standard-of-care expert. He testified that Dr. Welch caused B.M.'s nerve injury by improperly stretching his neck during delivery and rejected any other possible cause of the injury. J.A. 2625 ("In terms of a multiroot, five-level injury of this severity, permanent injury, it's my belief that forces of labor had no role in this."); J.A. 2627

12

([Family's counsel:] [C]an you tell us whether there is any other explanation for B.M.'s permanent injury other than improper stretching of the neck by the physician at the time of delivery? [Dr. Duboe:] In this particular case, . . . there's no other reasonable explanation in my opinion.").

His opinion conflicted with a professional guideline published in 2014 by the American Congress of Obstetricians and Gynecologists ("ACOG"),[3] which Appellees heavily relied upon in presenting their defense. The guideline, titled "Neonatal Brachial Plexus Palsy" ("NBPP"), contains the following findings:

> Maternal forces alone are an accepted cause of at least transient NBPP by most investigators. . . . . [E]ven properly applied axial traction can result in NBPP . . . .
> Neither high-quality nor consistent data exist to suggest that NBPP can be caused only by a specific amount of applied force beyond that typically used by health care providers during any delivery. Instead, available data suggest that the occurrence of NBPP is a complex event, dependent not only on the forces applied at the moment of delivery, but also on the constellation of forces (eg, vector and rate of application) that have been acting on the fetus during the labor and delivery process, as well as individual fetal tissue characteristics . . . .

J.A. 343.

Appellees sought to impeach Dr. Duboe by showing his bias against ACOG, arguing that he had "a personal motive to disagree with or play down the conclusions in ACOG's publications and/or experts affiliated with ACOG." J.A. 2832. To demonstrate that motive, Appellees moved to introduce evidence of Dr. Duboe's career history

---

[3] ACOG is "a non-profit professional association of physicians specializing in women's health care and representing approximately 95% of all board-certified obstetricians and gynecologists practicing in the United States." *Planned Parenthood of Cent. N.J. v. Farmer*, 220 F.3d 127, 130 n.1 (3d Cir. 2000).

13

showing that he was once a member of ACOG, but resigned from the organization after ACOG opened an investigation into an expert opinion he rendered in another medical malpractice case.

The Family responds on appeal that Dr. Duboe had provided an expert opinion supporting a claim against the defendant doctor in the other case without examining one particular medical report. Nine months later, he obtained and reviewed the report and decided to withdraw his opinion, but the defendant doctor filed a complaint against him with ACOG seeking an administrative investigation into Dr. Duboe's conduct as an expert witness. The Family admits that the ACOG investigation could have resulted in the organization's censure of Dr. Duboe. Before ACOG completed the investigation and rendered any decision, Dr. Duboe resigned from the organization because he was "very disappointed with the way [the allegation] was treated." J.A. 2743.

The Family objected to introducing Dr. Duboe's history with ACOG, but the district court overruled its objection on the basis that the history "certainly shows a reason, arguably, for a bias, and somebody here who's making comments negative to [ACOG] and its publication, the jury can know that he has that gripe. Even if you are wrongfully accused of something, you certainly potentially have the bias against somebody who made the wrong accusation." J.A. 2609–10.

On appeal, the Family argues that the district court erred by admitting Dr. Duboe's dispute history with ACOG, contending that evidence was inadmissible as past wrongful acts, had minimal probative value, and inappropriately suggested that he did not

diligently review the medical records in the case at bar. Appellees respond that Dr. Duboe's career history was relevant evidence of bias. We agree with Appellees.

"Exploring bias is a proper topic for cross-examination . . . ." *United States v. Kiza*, 855 F.3d 596, 604 (4th Cir. 2017). In fact, "[t]he second major function of cross-examination . . . is to show that the witness is biased, prejudiced, or untrustworthy for any reason." *United States v. Caudle*, 606 F.2d 451, 457 n.3 (4th Cir. 1979). "Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." *United States v. Abel*, 469 U.S. 45, 52 (1984). In *Abel*, the Supreme Court specifically held that that a witness' membership in an organization, "even without proof that the witness . . . has personally adopted its tenets, is certainly probative of bias." *Id.*

Here, Dr. Duboe's dispute history with ACOG was relevant evidence of bias because his expert opinion directly conflicted with the findings in ACOG's published guideline, which were crucial to Appellees' defense. Yet Dr. Duboe admitted that he had been "very disappointed" with ACOG because of the past incident involving its investigation of him. J.A. 2743. Thus, his possible animosity toward ACOG and any underlying history were relevant evidence that the jury was entitled to know. *See Abel*, 469 U.S. at 52.

Nonetheless, the Family argues the admission of Dr. Duboe's career history violated Federal Rule of Evidence 404(b)(1), which provides "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that

15

on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). It also relies on Rule 608(b), which prohibits the admission of extrinsic evidence to "prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." Fed. R. Evid. 608(b).

Neither rule applies here because the purpose of Dr. Duboe's dispute history was to show possible bias. The Family's argument muddles the key distinction this Court has drawn between "impeachment evidence proving bias and impeachment of general credibility." *Quinn v. Haynes*, 234 F.3d 837, 845 (4th Cir. 2000). We have held that "generally applicable evidentiary rules [such as Rules 404(b) and 608] limit inquiry into specific instances of conduct through the use of extrinsic evidence and through cross-examination with respect to general credibility attacks, but no such limit applies to credibility attacks based upon motive or bias." *Id*. (citation omitted). Thus, Rules 404(b) and 608 do not affect the admission of Dr. Duboe's career history, and the district court properly admitted the evidence.

### C.

The Family also challenges the exclusion of evidence related to a C-section. Before trial, Appellees filed a motion in limine to exclude "any evidence, testimony, or argument that under the standard of care, a [C-section] for Ms. Dorman was required in lieu of a vaginal delivery." J.A. 1924. The Family specifically agreed that a C-section was "not part of the standard of care." J.A. 1924. Based in part on the parties' agreement, the district court denied Appellees' motion as moot and ruled that "any testimony or

16

argument that a C-Section was required, including any mention of a C-Section []in this case" was barred. J.A. 1924–25.

Despite its pretrial concession, the Family sought to "introduce testimony showing that Dr. Welch may not have been prepared for the risk of a shoulder dystocia," arguing that this testimony would

> show that one of Dr. Welch's partners, Dr. Hays, had already scheduled Ms. Dorman for a C-Section, but that Dr. Welch was not aware of that decision, did not review prior ultrasound records showing that B.M. was a large baby, and did not know the precise size of the baby at the time of delivery.

J.A. 1925. The district court allowed the Family to introduce such testimony "only to show a potential lack of concern or assiduousness by Dr. Welch toward Ms. Dorman" because it was "possibly relevant to his credibility." J.A. 1925. The court strictly prohibited the use of any such testimony to "argue that Dr. Welch should have performed a C-Section" or to "mention the possibility of a C-Section as an alternative procedure in this case." J.A. 1925.

The Family asserts on appeal that the district court erroneously excluded all evidence related to a C-section because, without this evidence, the jury could not have fully appreciated the gravity of Dr. Welch's mistaken judgment that B.M.'s size was appropriate for a vaginal delivery. It further contends the excluded evidence would contradict Dr. Hays' allegedly false testimony that she was not concerned about the size of B.M. in June 2013.

We hold that the district court did not abuse its discretion in excluding the evidence related to a C-section. Putting aside any issue of a bait-and-switch tactic by the

17

Family's counsel, the Family conceded that Dr. Welch appropriately proceeded to a vaginal delivery and did not violate the applicable standard of care by not performing a C-section. Thus, Dr. Welch's decision not to order a C-section and Dorman's scheduled C-section are not facts "of consequence in determining the action." Fed. R. Evid. 401(b). Any such evidence is not probative of whether Dr. Welch applied excessive force and bent B.M.'s neck in delivering him, or whether Dr. Welch's alleged failure to exercise the standard of care during delivery caused B.M.'s injury. Thus, it bears no relevance to the sole question presented to the jury. And the Family did get to mention awareness of the scheduled C-section as a backdoor means of confusing the jury on the standard of care.

Furthermore, the Family sought to use the evidence concerning a C-section to impeach Dr. Hays' allegedly false statement, but nothing prevented it from impeaching its witness. Federal Rule of Evidence 607 states that "Any party, including the party that called the witness, may attack the witness's credibility." The Family had other evidence to impeach Dr. Hays' alleged lack of concern for B.M.'s large size, such as her own note that B.M. was "big." J.A. 1777. Dr. Hays also testified during trial that she knew B.M.'s large size and specifically mentioned his fetal weight. Thus, even without the evidence concerning a C-section, the Family had evidence to impeach Dr. Hays.

Regardless, Dr. Hays does not appear to have given testimony that the Family contends warranted impeachment. The Family alleges that Dr. Hays falsely testified "she was not concerned about the size of the baby on June 20, 2013." Reply Br. 21–22. Dr. Hayes' trial testimony does not match this allegation because the testimony suggests that she did not have medical concerns about Dorman's conditions in June 2013. J.A. 2574

18

("At that time, again, I said membranes intact; signs of preterm labor negative. She was not having any contractions at the time. LGA baby, meaning large for gestational age, and that it was 8 pounds at 35 weeks. At that time I was not concerned, and I said we'll reassess the weight at 38 weeks.").

Even assuming Dr. Hays gave false testimony and the district court erred, the Family fails to show that any error in the district court's exclusion of a C-section was not harmless. As discussed above, Dr. Hays' testimony could not have significantly influenced the jury's verdict because it did not concern the central issue of the standard of care. The district court further permitted the Family to use the evidence related to a C-section to impeach Dr. Welch's credibility. Given the contested evidence's lack of relevance and Dr. Hays' role in the trial proceedings, any error in the court's holdings was harmless. *See* Fed. R. Civ. P. 61. Accordingly, the district court properly excluded the evidence related to a C-section.

## D.

Lastly, we address two related arguments by the Family: that (1) the district judge improperly interjected his scientific opinions during the Family's cross-examination of Dr. Grimm, and (2) the judge was prejudicially hostile toward the Family throughout the trial.

Dr. Grimm was Appellees' causation expert and "a biomedical engineer who has published many peer-reviewed articles in the field of [NBPP.]" J.A. 1732 (footnote omitted). She was part of a task force that published an article through ACOG, which rejected the theory that only physician-applied forces could cause an infant's permanent

19

nerve injury. Dr. Grimm provided an opinion that "absent proof there was lateral traction or bending, the only remaining cause that could have caused the stretching injury are the maternal forces of labor." J.A. 1733. In support, she relied on a computer model developed using animal studies. Based partly on the results of this model, Dr. Grimm concluded that "maternal forces alone are able to cause a permanent [nerve] injury, even with normal amounts of physician-applied traction." J.A. 1734. The Family moved to exclude her testimony on the ground that her studies were based on animals, not on humans. But the district court rejected this argument, noting that Dr. Grimm was unable to "test the biomechanics of nerves in living humans" for ethical reasons. J.A. 1735.

During cross-examination the Family attempted to criticize Dr. Grimm's use of the animal studies in her model by using a picture of a baby goat. When Appellees objected to the use of this picture, the Family responded that the picture would show "there are no anatomical parts to this goat that can be compared to human anatomical parts." J.A. 3510. The district judge overruled Appellees' objection and let the Family proceed with the question and the picture although he responded to the Family's position, "That's silly. Anything can be compared to anything . . . ." J.A. 3511.

Later, the Family questioned Dr. Grimm about the Crofts study, which was a 16-year-long study on how certain training changed physicians' response to shoulder dystocia emergencies and resuscitation. The Crofts study specifically measured how often physicians used excessive traction in treating a shoulder dystocia throughout the course of training. In order to examine the study, Dr. Grimm asked for how the study

20

defined "excessive traction." J.A. 3518. The district court commented that it was "fair for [Dr. Grimm] to have a definition of what excessive traction is." J.A. 3518.

Despite Dr. Grimm's request and the court's inquiry, the Family's counsel was unable to define the term as it was used in the study. Dr. Grimm personally reviewed the Crofts study and was also unable to ascertain a definition of the term. Appellees' counsel then moved to strike the Family's questions regarding the study "if there's no definition." J.A. 3520. The court denied the request, but stated, "I don't think the chart is meaningful if we don't know what they meant by excessive [traction]." J.A. 3521. It further noted that the "jury can understand—the chart's value can be judged by the fact that there's no way to tell what they meant by excessive. All right. Let's move on." J.A. 3521.

On appeal, the Family argues that the district judge abdicated his role as an impartial adjudicator by offering his own scientific opinions. It specifically characterizes as improper scientific opinion the judge's comment that "asking [Dr. Grimm] to compare that there's no anatomical part of a goat that can be compared to a human" would be "silly" because "[a]nything can be compared to anything." J.A. 3510–11. The Family also points to the judge's statement that the chart in the Crofts study was not "meaningful if we don't know what they meant by excessive" traction. J.A. 3521.

Contrary to the Family's assertion, these statements merely show that the district judge was clarifying facts and Family counsel's questions. In doing so, the district judge reasonably exercised his broad authority and discretion in trial management, which includes "reasonable control over the mode and order of examining witnesses and

presenting evidence so as to . . . make those procedures effective for determining the truth [and] avoid wasting time." Fed. R. Evid. 611(a).

This Court has confirmed a trial court's broad authority by observing that "[q]uestions of trial management are quintessentially the province of the district courts." *United States v. Smith*, 452 F.3d 323, 332 (4th Cir. 2006). This scope of authority encompasses the district courts' "two core trial oversight responsibilities." *Id.* First, "it is settled beyond doubt that in a federal court the judge has the right, and often [the] obligation, to interrupt the presentations of counsel in order to clarify misunderstandings." *Id.* (alteration in original) (internal quotation marks omitted). Although trial judges are "not backstop counsel," they are obligated to "make certain that matters are clearly presented to the jury." *Id.*

Further, "district courts have an affirmative duty to prevent trials from becoming protracted and costly affairs." *Id.* This obligates district judges to "rein in . . . questioning when it strays too far from matters in dispute," such as when, "during the course of multi-week trials, witness questioning . . . skitter[s] off in collateral directions." *Id.* Trial judges also must "ensure that the presentation of evidence does not become rambling and repetitious," and "are thus entirely within their right to keep trial proceedings moving, and, if necessary, to ask counsel to pick up the pace." *Id.*

This broad discretion in exercising trial management allows trial judges to "seek greater involvement and take a firmer role." *Id.* at 333. As we held in *Smith*:

> even a stern and short-tempered judge's ordinary efforts at courtroom administration . . . do not establish bias or partiality. Trials are serious business. A district judge's interruptions, even when abrupt, may be only

22

part and parcel of a pointed adversarial process designed to develop a clear set of facts in a relatively short amount of time. A tart remark or two might be what is needed to keep a lengthy trial on track. The entire goal, of course, is to ensure that trials reach fair and just results—but while there is only one goal, there are many courtroom styles that can achieve it.

*Id.* (internal quotation marks and citations omitted).

Accordingly, we held in that case that the district judge properly managed a trial when he personally interrogated a witness, made "at least nineteen sua sponte objections" to counsel's questions, and attempted to rehabilitate a witness during cross-examination. *Id.* at 331. We determined that such conduct "revealed no bias and crossed no line," was "hardly inappropriate," but was instead "routine and innocuous." *Id.* at 333.

The district judge's conduct during the Family's cross-examination of Dr. Grimm was far less intrusive than the conduct we considered in *Smith*. When the Family's counsel tendered the baby goat picture, the judge wanted counsel not to ask a "silly" question, but to pose a focused, relevant question to Dr. Grimm. J.A. 3511. Likewise, when the judge said that the Crofts study was not "meaningful" without a definition of "excessive" traction, J.A. 3521, he was merely clarifying the importance of the term "excessive traction" because Dr. Grimm needed the definition in order to assess the study's validity. Overall, the judge's comments demonstrate that he was properly fulfilling the "obligation to clarify confused factual issues or misunderstandings" and to

23

prevent counsel's questioning from straying. *Smith*, 452 F.3d at 333 (internal quotation marks omitted). [4] [5]

Next, the Family asserts that the judge demonstrated general hostility towards it throughout the trial, resulting in undue prejudice against its case. This argument, however, is based on misrepresentations of the record. The Family takes the judge's comments out of context and mischaracterizes them while omitting its own misbehavior during trial.

For instance, the Family's counsel behaved inappropriately in front of the jury by "making numerous nonverbal communications to the jury, [including] smirking, laughing, [and] rolling his eyes" during Dr. Welch's testimony. J.A. 2196. Appellees' counsel raised this issue to the district judge and asked him to prohibit this behavior. The judge agreed, saying, "[y]es, [the Family's counsel] does have a tendency to display his emotions," and instructed counsel "not to be so overt with it." J.A. 2196–97. The Family's counsel did not deny making such gestures, but responded that he "may have been communicating something to" his co-counsel. J.A. 2197. This background provides

---

[4] In fact, the district judge's trial comments were even-handed and equally directed at Appellees and the Family. For instance, when Appellees' counsel inaccurately read quotations from the transcript to the Family's expert witness, Dr. Kozin, during cross-examination, the judge noted, "[c]ome on, you can read it accurately, and we don't have to have this debate." J.A. 2324. As evidenced by this example, the judge's trial conduct did not favor either side.

[5] Additionally, in a footnote, the Family argues that because Dr. Grimm is not an obstetrician, the district court improperly allowed her to testify whether the record supported that B.M.'s neck was bent in delivery. Although not a medical doctor, Dr. Grimm is a recognized scientific expert in the field of the relevant nerve injury and has studied the nerve injury pattern by using engineering models and animal tests. Thus, the question was well within her recognized expertise.

24

sufficient context for the judge's later comment to counsel, "What are you smiling about? It's not a joke." J.A. 2400. On appeal, the Family characterizes these incidents as "scolding" counsel and representing the district judge's "negative feelings" and "distrust" toward counsel. Opening Br. 51–52.

Read in full context, we conclude the Family's argument is meritless, if not disingenuous, and we reiterate our holding in *Smith*:

> We recognize that judges can take cases from the hands of counsel, and can abuse both their courtroom authority and the respect and deference with which jurors may regard them. But it is likewise true that counsel can take cases from judges, through a variety of dilatory, badgering, and diversionary tactics. The delicacy of the balance suggests appellate caution in removing the reins from trial judges in basic matters of litigation management. We find no reason to do so here. Defendants may not point to isolated portions of a voluminous record in the apparent assumption that split-second exchanges between trial participants tarnished a well-run and lengthy case. There was no reversible error . . . in the trial court's conduct.

452 F.3d at 334. That was equally true in this case.[6]

III.

For all the foregoing reasons, the district court's judgment is

*AFFIRMED.*

---

[6] The Family also argues that the district court erred by preventing its economic expert from presenting statistical evidence of B.M.'s future lost income. But because the Family failed to prove that Dr. Welch's alleged negligence during delivery caused B.M.'s injury, any error as to potential damages was moot, if not harmless.

Furthermore, we dismiss Appellees' cross-appeal because Appellees "seek nothing more than to preserve the judgment[ ] in their favor." *Vogel v. Linde*, 23 F.3d 78, 79 n.3 (4th Cir. 1994); *see Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 155–56 (4th Cir. 2012) (dismissing the cross-appeal because the appellee merely sought "affirmance of the district court's judgment").